GUILLERMO OCASIO CARRASQUILLO, ETC., demandantes y recurridos, *v.* JOSÉ ROSA BERRÍOS, por sí y como ALCALDE DEL MUNICIPIO DE MAUNABO, demandado y recurrente.

*Número:* R-84-356 *Resuelto:* 19 de abril de 1988

40

*Rafael S. Fuentes Rivera* y *Sixto Pabón García,* abogados del recurrente; *Eliezer Aldarondo Ortiz,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Ante el Tribunal Superior, Sala de Carolina, Guillermo Ocasio Carrasquillo y su esposa Laura G. Ocasio Bravo, por sí y a nombre de la Sociedad de Gananciales, presentaron demanda de daños y perjuicios por libelo y calumnia contra José Rosa Berríos —como Alcalde del Municipio de Maunabo y en su carácter personal— conjuntamente con su esposa Emma Rosa Collazo, y al periódico *El Vocero de Puerto Rico, Inc.*

En síntesis, Ocasio Carrasquillo alegó que, falsa, maliciosa y negligentemente Rosa Berríos —elegido en las elec-

ciones de 1980 por el Partido Popular Democrático (P.P.D.)— le imputó en un escrito titulado *Mensaje al Pueblo* no haber cumplido con las obligaciones asumidas hacia el municipio en un contrato de asesoramiento profesional y aun así cobrado la cantidad de $7,000; que instigó maliciosa y negligentemente a que se practicase en su contra una investigación sobre malversación de fondos, y que *El Vocero* publicó falsamente, con igual malicia y negligencia, lo concerniente a dicha investigación. Reclamó para sí y su esposa Laura G. $300,000. Ocasio Carrasquillo enmendó subsiguientemente la demanda para alegar que por su condición de miembro del Partido Nuevo Progresista (P.N.P.), Rosa Berríos —por razones político-partidistas— dejó sin efecto dicho contrato. Los demandantes reclamaron $50,000 adicionales. *El Vocero* negó responsabilidad;(1) igual hicieron el municipio, Rosa Berríos y su esposa. Éstos adujeron que las gestiones realizadas fueron lícitas y, además, que Ocasio Carrasquillo era una figura pública. El municipio formuló una reconvención fundada en que cobró en exceso la suma de $7,000 y solicitó el reembolso.

Previa vista al efecto, el tribunal declaró con lugar la demanda. Acordamos revisar.

## I

Se impone una reproducción fiel y exacta del trasfondo fáctico emergente de un análisis minucioso e integral de la prueba testifical y documental.(2)

---

(1) Durante el trámite posterior, los demandantes Ocasio-Ocasio desistieron contra dicho rotativo según plasmado en Sentencia Parcial de 31 de mayo de 1983.

(2) En esta tarea —según la norma de deferencia hacia los foros de instancia— habremos de respetar las determinaciones de hecho, salvo aquellas que son determinaciones mixtas de hecho y de derecho tales como si las publicaciones fueron negligentes, falsas o maliciosas. *Garriga Bengoa v. Comisión Industrial,* 87 D.P.R. 715 (1963); *Sanabria v. Sucn. González,* 82 D.P.R. 885 (1961). Igual enfoque brindaremos a las que no tienen apoyo en la prueba documental. Sobre

Ocasio Carrasquillo se desempeñó como investigador-auditor en la Oficina del Contralor de Puerto Rico desde 1967. En su capacidad de Especialista en Consultoría IV, durante los meses de febrero, marzo, abril y mayo de 1980, realizó una auditoría de los libros del Municipio de Maunabo correspondientes al año fiscal 1979–1980. A fines de mayo discutió con el entonces alcalde Samuel García Ortiz, electo en 1976 por el P.N.P., el borrador preliminar de esa intervención. Rindió al Contralor el informe correspondiente a su auditoría con sus recomendaciones. El 30 de junio de dicho año renunció al cargo que ocupaba en la Oficina del Contralor para iniciarse en la práctica privada de asesoramiento sobre auditoría y gerencia municipal. De inmediato ofreció directamente sus servicios a varios municipios.(³) Mes y medio después, el 15 de agosto, se le otorgó un contrato de servicios profesionales y consultoría con el alcalde García Ortiz. Mediante el mismo, se obligó a dar asesoramiento fiscal y gerencial con relación a la auditoría municipal, representar al municipio en aquellas gestiones pertinentes ante las diferentes agencias del gobierno estatal y mantener al día las operaciones de tesorería y finanzas, incluso una auditoría mensual de tales operaciones. El municipio acordó satisfacerle quinientos dólares ($500) mensuales pagaderos al último día del mes. El contrato tendría vigencia desde el 15 de agosto de 1980 al 30 de agosto de *1982*.

Nuevamente, el 16 de octubre —mes y medio después del *primer* contrato y quince (15) días antes de las elecciones generales— Ocasio Carrasquillo y el alcalde García Ortiz suscribieron un segundo "contrato adicional". Esta vez, éste

---

éstas, sabido es que este Foro apelativo está en igual posición que instancia. *Torres Arzola v. Policía de P.R.*, 117 D.P.R. 204 (1986), y casos allí citados.

(³) Para esa fecha ya asesoraba también los Municipios de Cataño, Loíza, Barceloneta, Vieques y Trujillo Alto. Para septiembre comenzó en Manatí. T.E., Vol. I, pág. 191.

se comprometió a realizar un estudio del personal municipal, hacerle recomendaciones al alcalde y prepararle un programa de igualdad en el empleo para aquellos programas municipales que operaban con fondos federales. Además, en los casos necesarios, revisaría los modelos mensuales·de auditoría Núms. 28 y 29, *revisaría las liquidaciones presupuestarias para 1977 y 1978 —las cuales no se habían realizado correctamente—* y supervisaría el cuadre de los libros de Registros de Libramiento y Registro de Ingresos *al 30 de junio de 1980*. Por estos servicios sería compensado en la suma de $7,000. Su vigencia sería hasta el 31 de diciembre de 1980. El ex alcalde García Ortiz testificó que ello era retroactivo e "incluía además el poner al día todas las fallas y omisiones encontradas en la intervención del Contralor en el período que fue intervenido". T.E., Vol. I, pág. 69. Aun cuando el propio Ocasio Carrasquillo atestó que asesoró al entonces auditor municipal Nicolás Santiago de la obligación de ley de llevar un Registro de Órdenes y Contratos (Modelo 26), inexplicablemente ninguno de estos dos contratos fue registrado. T.E., Vol. I, pág. 291. Sólo se anotaron los pagos bajo el *primer* contrato en el Libro Mayor, que es la constancia de registro de los pagos municipales. Copias de los mismos no fueron remitidas a la Oficina del Contralor, según lo requiere la ley. Tampoco Ocasio Carrasquillo exigió el cumplimiento de ambos requisitos ni tomó la salvaguarda de directamente, como ex funcionario de la Oficina del Contralor, así registrarlos y remitirlos. T.E., Vol. I, págs. 292–293. Por su parte, García Ortiz expresó que eso correspondía al Auditor y no al Alcalde.

La prueba revela que, al momento de otorgarse ambos contratos, la Oficina del Contralor no había rendido el informe sobre su auditoría e investigación realizada en dicho municipio.

Aunque el foro de instancia determinó que "en el presupuesto del año fiscal de 1981 existía partida y ésta tenía

fondos suficientes para el pago de los servicios prestados bajo los dos contratos de servicios profesionales", la prueba documental y testifical derrotan tal conclusión. El *Exhibit* X —folio 201 del Libro Mayor, Partida 3027, de Servicios Técnicos y Asesoramiento S.M.— en que se apoya, únicamente revela que la partida *original* presupuestada fue de sólo $3,000. Así lo aceptó Ocasio Carrasquillo. T.E., Vol. I, pág. 198. De estos $3,000, para 8 de julio, y 18 y 29 de agosto de 1980, respectivamente, se había pagado un total de $1,500, que razonablemente inferimos correspondieron a desembolsos por otras obligaciones incurridas contra esta partida con anterioridad al 15 de agosto de 1980. Ello significa que, al vencer el mes de agosto, sólo restaban $1,500 de la partida original en el Presupuesto 1980–1981.

Ocasio Carrasquillo prestó sus servicios por acudir un (1) día laborable a la semana al municipio. Llevaba además trabajo a su hogar. T.E., Vol. I, pág. 60.

Al decir del tribunal de instancia, las "elecciones celebradas en noviembre de 1980 en el pueblo de Maunabo no fueron la excepción a lo acontecido en el resto de la Isla de Puerto Rico. . . . El resultado electoral fue bien cerrado y ameritó un recuento de votos. Finalmente el aquí demandado y aspirante a Alcalde por el Partido Popular Democrático (P.P.D.) Sr. José Rosa Berríos fue declarado vencedor en dichos comicios electorales. El entonces Alcalde incumbente por el P.N.P., Sr. Samuel García Ortiz fue derrotado en sus aspiraciones eleccionarias". Sentencia, Anejo A, pág. 6.

Con fecha de 24 de diciembre se preparó una orden y comprobante de pago a nombre de Ocasio Carrasquillo por la suma de $1,500 para satisfacer el período desde el 15 de agosto hasta el 15 de noviembre.

En el ambiente político la tensión continuó. Ello movió a que Rosa Berríos, como Alcalde electo certificado el 26 de diciembre, tuviera que acudir al Tribunal Superior, Sala de Guayama (Civil Núm. C-80-3079), y el 31 de diciembre de

1980 obtuviera un *mandamus* contra García Ortiz, que le ordenaba nombrar a los miembros de un Comité de Transición Municipal. Presumiblemente, por su confianza política y conocimientos, el alcalde saliente García Ortiz designó a Ocasio Carrasquillo como uno de los integrantes que, con otros funcionarios municipales, iba a representar su administración en ese comité. Aun así continuaron las dificultades. El 7 de enero de 1981 ocurrieron varios hechos de importancia. Primero, dicho foro tuvo que ordenarle al Comité de Transición Municipal y a sus miembros, bajo apercibimiento de desacato, que sin dilación comenzaran labores y prepararan un inventario pormenorizado de la planta física, materiales, equipo y documentos obrantes para ser suscritos por varios funcionarios municipales y los miembros del comité. Dicho foro concedió término hasta el 11 de enero.

Segundo, como resultado de ese mandato judicial, en la única reunión celebrada por el Comité de Transición Municipal, Rosa Berríos anticipó a Ocasio Carrasquillo que al tomar posesión del cargo prescindiría de sus servicios. Después de ese día, éste no regresó más al municipio.

Y tercero, como no había fondos suficientes, el alcalde saliente García Ortiz suscribió la Resolución Núm. 3, Serie 1980–1981, que traspasa, entre otras partidas *originales* consignadas en el presupuesto, la suma de $8,000 a la Partida 3027 sobre Servicios Técnicos y Asesoramiento. *Exhibit* XI. Al hacerlo, invocó el Art. 73 de la anterior Ley Municipal(4) y expuso que los créditos consignados en las partidas originales eran "insuficientes debido a los muchos gastos de servicios". Inmediatamente fueron preparados los documentos y se ordenó el libramiento Núm. 627 para satisfacer $1,000

---

(4) Disponía:

"El alcalde en consulta con el funcionario administrativo correspondiente podrá, de sobrantes disponibles no comprometidos, autorizar transferencias de crédito entre partidas presupuestarias dentro de la dependencia que dicho funcionario dirija." 21 L.P.R.A. ant. sec. 1461.

del *primer* contrato de Ocasio Carrasquillo. Al otro día, 8 de enero, mediante libramiento Núm. 651, le pagaron $7,000 en concepto del *segundo* contrato.

Cinco (5) días después, el 12 de enero de 1981, Rosa Berríos tomó posesión como nuevo Alcalde. Retroactivo al 1ro de enero, contrató a Raúl Colón Rodríguez —ex Presidente de la Asamblea Municipal de Santa Isabel y militante reconocido del P.P.D.— para que prestara al Municipio de Maunabo asesoramiento técnico y de consultoría en finanza, presupuesto y otras áreas administrativas. Este primer contrato —registrado cinco (5) meses más tarde en el Registro de Órdenes y Contratos por la Secretaria Auditora Amelia Sugrañes González (T.E., Vol. II, pág. 23)— venció el 30 de junio de 1981. Al finalizar, el contrato le fue renovado en dos (2) ocasiones. Las funciones de este asesor son básicamente las mismas que prestaba Ocasio Carrasquillo.

El 5 de febrero el Tribunal Superior, Sala de Guayama, en el antes mencionado caso de *mandamus*, declaró en corte abierta incursos en desacato civil al ex alcalde García Ortiz y a los miembros de su Comité de Transición Municipal, entre ellos, Ocasio Carrasquillo. Ordenó sus arrestos e ingreso en el Centro de Detención Regional. Los arrestos no fueron diligenciados, pues dicho foro, a instancia de otros miembros, concedió hasta el próximo día para cumplir lo ordenado.

Aun así, el 6 de febrero, el periódico *El Vocero* publicó en su primera página como titular "Arrestan Ex Alcalde de Maunabo". La noticia hacía referencia a que el ex alcalde García Ortiz y varios de sus ex ayudantes —incluso Ocasio Carrasquillo— habían sido arrestados el día anterior por el Alguacil General del Centro Judicial por haberse rehusado a cumplir una orden del Juez Superior Carlos Juan Rodríguez De Jesús, quien les ordenó que se reunieran con el comité de transición del alcalde popular electo, Rosa Berríos. Se informó, además, que el Juez Rodríguez De Jesús, al oír los planteamientos de los detenidos, les concedió un término de

veinticuatro (24) horas para constituir el Comité de Transición Municipal con el comité nombrado por el nuevo Alcalde.

Al asumir sus funciones, preocupado por el estado fiscal del municipio, el alcalde Rosa Berríos realizó varias gestiones. Pidió a la Administración de Servicios Municipales que examinara y cotejara los libros de contabilidad y evaluara la situación financiera municipal. Fechado 1ro de mayo, dicha administración rindió el Informe NAGF23–81. Con referencia a la última liquidación presupuestaria correspondiente al año fiscal 1976–1977, dicho informe consignó que "los libros y registros de contabilidad reflejaban atrasos y múltiples errores, por lo que se dificultó la labor de recopilación . . .". Anejo M, pág. 51. Poco después, Rosa Berríos preparó, suscribió y circuló en el pueblo de Maunabo un escrito titulado *Mensaje al Pueblo*. Aunque no mencionaba a Ocasio Carrasquillo, hacía alusión a ciertas circunstancias que permitían identificarlo. En lo pertinente disponía:

> También mediante la Resolución 3 precedentemente mencionada, hicieron una transferencia por la cantidad de $7,000.00 de la partida Aportación Patronal y Sistema Retiro para el pago de un Asesor Financiero que contrató el Ex-Alcalde. Este contrato fue firmado en agosto de 1980, para ser efectivo a esa fecha y donde especifica que le pagarían a razón de $500.00 mensuales para que éste mantuviera entre otros asuntos las finanzas en Auditoría al día, *desgraciadamente no fue así porque había informes, liquidaciones presupuestarias, libros, etc. completamente atrasados, y lo peor de todo es que según el contrato este asesor cobraría a razón de $500.00 que le correspondía haber cobrado desde agosto 15 de 1980 hasta enero 12 de 1981 la cantidad de $2,500.00 pero según los libramientos 607 de 12/24/80 por $1,500.00, Lib. 627 1/7/81 por $1,000.00 y Lib. 651 de 1/7/81 por $7,000.00 sumando estos pagos le pagaron la cantidad de $9,500.00. Este asesor fue quien vino de la Oficina del Contralor de P. R. a dirigir la Intervención que hicieran en este Municipio en enero de 1980, pero no se sabe qué pasó porque en agosto aparece firmando un contrato con el Municipio de Maunabo y hasta*

*esta fecha no se ha dado a la luz pública dicho informe reali-*
*zado por este Asesor por la Oficina del Contralor. ¿Conflicto*
*de intereses?* (Énfasis suplido.)

Rosa Berríos también escribió a la Oficina del Contralor
para solicitar una investigación.

Todavía insatisfecho, a principios de noviembre de 1981
acudió ante el fiscal Juan B. Algarín, de Humacao. Lo acom-
pañó su asesor legal. El propósito fue someter una querella
para investigar el alegado mal uso de fondos municipales.
Presentó copia del *primer* contrato y los $7,000 de desem-
bolsos referentes a Ocasio Carrasquillo. El fiscal Algarín
examinó los documentos y se limitó a referirlo al Cuartel de
la Policía de Maunabo. No impartió ninguna instrucción es-
pecial al Cuerpo de Investigaciones Criminales (C.I.C.). Es-
timó que el asunto ameritaba una querella que debía
investigarse. A juicio suyo notó "que algo no estaba bien".
T.E., Vol. I, pág. 26. Dicho Fiscal no dio ninguna información
a la prensa y el caso nunca le fue nuevamente referido.

Rosa Berríos presentó la querella. Debido a que los cuar-
teles de la Policía son centros de noticias abiertos a los dis-
tintos medios de comunicación, el 4 de noviembre *El Vocero*
publicó un titular que leía:

En Municipio de Maunabo: Investigan Malversación de
Fondos. Se indica que agentes de la Unidad de la Propiedad
del C.I.C. y la Fiscalía iniciaron una pesquisa sobre una ale-
gada malversación de fondos promovida por el Alcalde Rosa
Berríos contra Guillermo Ocasio. Se alega que éste tenía un
contrato con el Municipio donde estaba supuesto a cobrar
$500.00 mensuales, que cobró en exceso la cantidad de
$7,000.00. . . . El Alcalde Rosa Berríos radicó su querella ante
el Fiscal Juan B. Algarín de la Fiscalía de Humacao y éste a su
vez impartió instrucciones para que el C.I.C. realice una in-
vestigación para determinar si en estos hechos hay uno de

estos delitos, malversación de fondos, conspiración, o apropiación ilegal agravada.(5) Anejo A, pág. 9.

Estas noticias se produjeron sin que mediara la intervención directa con la prensa por parte del fiscal Algarín o el alcalde Rosa Berríos. No hay prueba de tal gestión. Concluimos que fueron el producto de la actividad diaria investigativa que dinámicamente la prensa realiza al cubrir los cuarteles de la Policía del país.

Accedimos a la petición del alcalde Rosa Berríos, por instrucciones del Contralor el 15 de enero de 1982, el Sr. Edward Rivera Correa, auditor de esa oficina, reinvestigó el período que había auditado Ocasio Carrasquillo durante sus funciones oficiales, además de sus contratos y pagos poste-

---

(5) Su texto íntegro señala:

"MAUNABO —(Por Rubén Rodríguez, Redactor)— Agentes de la Unidad de Delitos contra la Propiedad del C.I.C. y la Fiscalía iniciaron una pesquisa sobre una alegada malversación de fondos. . . . La querella fue presentada a las autoridades por el Alcalde José Rosa Berríos, contra Guillermo Ocasio Carrasquillo.

"El Alcalde alega que Ocasio Carrasquillo, quien tenía un contrato con el municipio donde estaba supuesto a cobrar $500.00 mensuales, cobró en exceso la cantidad de $7,000.00.

"Afirma el querellante que el empleado residente en la Calle 21 de Villa Carolina en Carolina, suscribió el contrato con el anterior Alcalde Samuel García, el pasado 8 de enero del 80. Dijo que para el mes de agosto del 81, éste debía haber cobrado la cantidad de $2,500.00 a razón de $500 mensuales. Al hacer una revisión de los pagos hechos a empleados por contrato, se encontró que Ocasio Carrasquillo había cobrado la cantidad de $9,500.00, o sea, un exceso de $7,000.00.

"El Alcalde Rosa Berríos radicó su querella ante el Fiscal Juan B. Algarín, de la Fiscalía de Humacao, y éste a su vez impartió instrucciones para que el C.I.C. realice una investigación para determinar si en estos hechos hay uno de estos delitos, malversación de fondos, conspiración o apropiación ilegal agravada." Anejo A, pág. 9.

También en esa fecha el periódico *El Mundo*, en su columna *Breves Policiacos*, suscrito por Tony Santiago bajo el título *Investigan el Municipio de Maunabo* expuso la investigación por el Fiscal Algarín y el C.I.C. "a petición del alcalde maunabeño José Rosa Berríos". Sin mencionar nombre hizo alusión a un contratista de Carolina que cobró "una suma en exceso de lo estipulado en el contrato".

riores. Terminó el 2 de julio. Rindió al Contralor su informe. A esta fecha el Contralor no ha rendido el Informe Final.(6)

El 5 de abril de 1982, Rosa Berríos también pidió al Secretario de Justicia una investigación de los contratos otorgados con Ocasio Carrasquillo y si ello era en violación a la ley.

Las noticias publicadas por *El Vocero* referentes a la querella ante el fiscal Algarín y la Policía, y la diseminación en Maunabo del escrito *Mensaje al Pueblo* motivaron comentarios lesivos al carácter y honestidad de Ocasio Carrasquillo quien, en unión a su esposa Laura G., experimentó hondas preocupaciones. Sufrieron daños mentales, estimados por el tribunal de instancia en $50,000 y $25,000, respectivamente. Además, causaron una merma en sus ingresos profesionales por servicios a distintos municipios de $82,600 en 1981 a $30,545.50 en 1982.

## II

Para enmarcar en sus correctas coordenadas la adjudicación fiel de las interesantes controversias que suscita este recurso, resulta preciso exponer inicialmente los preceptos principales atinentes en materia de presupuestos, contratos y desembolsos según la antigua Ley Municipal —Ley Núm. 142 de 21 de julio de 1960 (21 L.P.R.A. sec. 1101 *et seq.*)— que es la que rige su solución.(7)

---

(6) Inferimos que esa tardanza responde al ejercicio válido de su discreción fundada en una espera prudencial para permitir deferencialmente al Poder Judicial adjudicar de manera final y firme este asunto.

(7) El tribunal sentenciador correctamente determinó que esa era la ley aplicable. El Municipio de Maunabo sostuvo lo contrario con miras a situar los contratos de 15 de agosto y 16 de octubre de 1980 en el ámbito del Art. 7.08 de la actual Ley Orgánica de los Municipios, Ley Núm. 146 de 18 de junio de 1980 (21 L.P.R.A. sec. 2001 *et seq.*). Su inciso (b) dispone que "[d]urante este mismo período [año electoral] el municipio no podrá comprometerse en contratos de arrendamiento o de servicios excepto en aquellos casos o situaciones en que se vean

El año económico de todo municipio comienza el 1ro de julio y termina el 30 de junio del año siguiente. 21 L.P.R.A. ant. sec. 1351. Corresponde al Alcalde preparar un modelo de presupuesto para ser oportunamente sometido y aprobado por la Asamblea Municipal. 21 L.P.R.A. ant. sec. 1352. Como plan primario fiscal deberá contener "(a) un resumen general, (b) un estimado detallado de recursos, y (c) un estado comparativo de las asignaciones propuestas y las del año anterior". 21 L.P.R.A. ant. sec. 1353. La Asamblea Municipal puede insertar nuevas partidas y aumentar o disminuir las propuestas. 21 L.P.R.A. ant. sec. 1354. Una vez aprobado, el presupuesto regirá durante el año fiscal aunque, como regla general, el Alcalde puede "de sobrantes disponibles no comprometidos autorizar transferencias de crédito entre partidas presupuestarias dentro de la dependencia que dicho funcionario dirija". 21 L.P.R.A. ant. sec. 1461. Para un municipio poder válidamente obligarse, es menester la existencia de fondos así presupuestados. Por ende, no puede incurrir en obligaciones o costos en exceso de los créditos asignados, salvo casos de emergencia debidamente justificados, y ello hasta un máximo de cinco por ciento (5%) en exceso. 21 L.P.R.A. ant. sec. 1462.

Ahora bien, el uso y flexibilidad de fondos presupuestados sufría una importante excepción durante año eleccionario. El Art. 66 de la anterior Ley Municipal disponía:[8]

---

amenazados de interrupción o se interrumpan servicios esenciales a la comunidad". 21 L.P.R.A. sec. 3208(b).

La vigencia de la actual Ley Orgánica de los Municipios, de acuerdo con su Art. 13.03 (21 L.P.R.A. sec. 2001 nt.) fue a partir del 1ro de julio de 1981. Otras disposiciones comenzaron una vez promulgados ciertos reglamentos no más tarde de un (1) año desde su aprobación.

[8] La ley vigente contiene idéntica disposición, salvo unas modificaciones de estilo insustanciales. Según expuesto, añade como inciso (b) que durante el período eleccionario el municipio no podrá comprometerse en contratos de arrendamiento o de servicios, excepto en aquellos casos o situaciones en que se vean amenazados de interrupción o se interrumpan servicios esenciales a la comunidad. 21 L.P.R.A. sec. 3208.

*Durante el período comprendido entre julio 1 del año en que celebren elecciones generales y la fecha de la toma de posesión de los nuevos funcionarios electos en dichas elecciones generales, no se podrá incurrir en obligaciones o gastos que excedan del cincuenta (50) por ciento de la asignación presupuestaria de cada partida, y a tal fin el Director de Finanzas, el Auditor o el Secretario Auditor, según sea el caso, deberá abstenerse de registrar o certificar ninguna orden que exceda la limitación fijada en esta sección;* disponiéndose, sin embargo, que esta limitación no se aplicará a las mejoras permanentes, ni a la compra y reparación de equipo, ni a la celebración de las Fiestas Patronales o días festivos, cuando se haya provisto partida separada en presupuesto para su celebración, en aquellas partidas cuya inclusión en presupuesto es mandatoria, con preferencia a los gastos de administración, operación y mantenimiento de todas y cada una de las dependencias del municipio, según lo establece la sec. 1360 de este título, y ni a las retenciones que haga el Secretario de Hacienda en cobro de deudas estatutarias o contractuales contraídas con entidades del Gobierno Estatal. No obstante esta limitación, el municipio podrá, con la aprobación de no menos de dos terceras (⅔) partes del número de miembros de que se compone la Asamblea Municipal, incurrir en otros gastos y obligaciones que no excedan del sesenta (60) por ciento de la asignación presupuestaria de *cada partida* en el período antes mencionado. Una parte proporcional de "un miembro" se considerará como que requiere un voto adicional. (Énfasis suplido.) 21 L.P.R.A. ant. sec. 1454.

La importancia de este precepto exige que concentremos brevemente nuestra atención en el mismo. Su lectura refleja que el límite de cincuenta (50) por ciento comienza desde el 1ro de julio —concordante con el inicio del año fiscal— y se extiende hasta "la fecha de la toma de posesión de los nuevos funcionarios electos". Específicamente, la prohibición y tope límite es de la "asignación presupuestaria de *cada* partida". Este mandato legislativo sólo admite, como excepciones, las mejoras permanentes, la compra y reparación de equipo, la celebración de las fiestas patronales si

ha sido presupuestada separadamente, y ciertos gastos pre-ferentes. *No exceptúa los servicios profesionales de consulta y asesoría.* La Asamblea Municipal sólo puede aumentar el límite "de *cada* partida" hasta un máximo de sesenta por ciento (60%). Como corolario, de acuerdo con lo dispuesto en el Art. 66 antes mencionado, un alcalde no puede incrementar ese tope de cincuenta por ciento (50%) al hacer, durante el período de veda, transferencias de otras partidas de sobrantes disponibles no comprometidas. Permitirlo derrotaría el interdicto estatutario en el período del año de elecciones, ya que esas transferencias permitirán inflar *cada partida.* De este modo honramos la intención legislativa. Aunque su historial es magro, de su texto podemos detectar que se inspira en el laudable propósito de sana política administrativa fiscal para evitar que, por razones estrictamente partidistas, se incurra en excesos durante el primer semestre fiscal y se agoten o queden sustancialmente disminuidas las arcas municipales para el segundo semestre, que puede coincidir o no con un cambio en la administración.

Además, tiene pertinencia la Ley Núm. 18 de 30 de octubre de 1975 que, con sujeción a ciertas salvedades, impone a los departamentos, agencias, instrumentalidades, oficinas, todo otro organismo y *los municipios* la obligación *"sin excepción alguna* de mantener un registro de todos los contratos que otorguen, incluyendo enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha del otorgamiento del contrato o la enmienda". (Énfasis suplido.) 2 L.P.R.A. sec. 97.

Este precepto, también de sana política administrativa pública, refleja el interés legislativo de evitar pagos y reclamaciones fraudulentas o ilegales, al crear un mecanismo de cotejo para perpetuar circunstancial y cronológica-

mente dichos contratos, y requiere que: (1) se reduzcan a escrito; (2) se mantenga un registro fiel con miras a prima facie establecer su existencia; (3) se remita copia a la Oficina del Contralor como medio de una *doble* constancia de su otorgamiento, términos y existencias, y (4) se acredite la certeza de tiempo, esto es, haber sido realizado y otorgado quince (15) días antes. En armonía con este diseño, los tribunales debemos mirar con cautela reclamaciones fundadas y de acuerdo con contratos, en los cuales las autoridades ejecutantes no han dado cumplimiento a este mandato. Solamente así puede quedar plenamente satisfecho el sentir legislativo y la conciencia judicial adjudicativa sobre desembolsos de fondos públicos.

█ Finalmente, no podemos olvidar que la reiterada ausencia del Registro de Contratos y la injustificada omisión en la remisión de la copia de un contrato a la Oficina del Contralor pueden dar margen, en circunstancias apropiadas y ante la presencia de otras actuaciones ilícitas, a que el funcionario concernido municipal incurra en la responsabilidad penal dispuesta en "el Código Penal o cualquier otra ley, en cuanto a delitos en que medien factores de beneficio personal o corrupción en relación con fondos públicos". 21 L.P.R.A. ant. sec. 1621(6). Apliquemos toda esta normativa al caso de autos.

Según lo antes indicado, la partida Núm. 3027 asignada originalmente en el presupuesto general para Servicios Técnicos y Asesoramiento ascendía a $3,000. Al 18 y 29 de agosto de 1980, tres (3) y catorce (14) días, respectivamente, después de firmarse el *primer* contrato, la partida Núm. 3027 estaba reducida a $1,500.[9] Esta última cantidad estaba

---

[9] Obviamente, según expuesto, la única conclusión razonable es que estos desembolsos previos de $1,500 respondían a unas obligaciones incurridas antes del 15 de agosto.

congelada por ley. No podía ser obligada por dicho contrato y, menos aún, desembolsada por el alcalde García Ortiz, pues matemáticamente representaba el máximo de cincuenta por ciento (50%). No hay prueba de que la Asamblea Municipal autorizara un aumento de un diez por ciento (10%) para esa partida.

Por igual razón, la Resolución Núm. 3 de 7 de enero de 1981, adoptada por el alcalde saliente García Ortiz cinco (5) días antes de tomar posesión la nueva administración, tampoco podía validar legítimamente la transferencia de los $8,000 de las partidas sobrantes a la Núm. 3027 sobre Servicios Técnicos y Asesoramiento. El propio Ocasio Carrasquillo admitió *que al momento de* otorgarse ambos contratos realmente no existían fondos disponibles. T.E., Vol. I, pág. 294.

▋ Lo expuesto se proyecta más allá del plano preceptivo fiscal. Afecta jurídicamente la validez de los dos (2) contratos suscritos por Ocasio Carrasquillo. *Ambos* son nulos por razón de que no existía partida presupuestaria válidamente disponible. *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682 (1987). Se trata de unos contratos *ultra vires*, cuya nulidad es un imperativo legal. 21 L.P.R.A. ant. sec. 1621.

Resolvemos que erró el tribunal sentenciador al validar los contratos suscritos entre el alcalde García Ortiz y Ocasio Carrasquillo.[10]

---

[10] Debido a este resultado nos abstendremos de evaluar el señalamiento de que erró el foro de instancia al concluir que Ocasio Carrasquillo había prestado totalmente los servicios relativos al segundo contrato. Basta señalar que la prueba fue conflictiva. Él mismo declaró que su trabajo estaba terminado y los papeles de manuscrito los dejó en el municipio para que los transcribieran a maquinilla. T.E., Vol. I, págs. 307-308.

## III

De igual forma incidió en los efectos adjudicativos sobre discrimen político-partidista que le atribuyó a la cancelación del *primer contrato* por el nuevo alcalde Rosa Berríos.

 Ocasio Carrasquillo no era empleado municipal al momento de suscribir dicho contrato. Tampoco adquirió esa condición. Según este supuesto, el alcalde García Ortiz al reclutar sus servicios utilizó pura y simplemente el esquema jurídico de libre contratación que ofrece el Código Civil. Al anularse el contrato por violaciones a la anterior Ley Municipal, nada puede reclamar en la órbita constitucional. Nuestro ordenamiento no tolera la figura del "empleado de confianza por contrato", si ello conlleva un menoscabo en las facultades de remoción que la ley concede a un nuevo ejecutivo municipal.

Pero hay más. Ante el decreto de nulidad que hoy sancionamos, podría argumentarse que aun contractualmente era acreedor a la protección contra el discrimen político. Esta hipótesis, de diversa contextura jurídica, nos remitiría frontalmente al planteamiento de discrimen en sus dos vertientes clásicas, a saber, requisito de prueba y excepciones a la norma constitucional que lo prohíbe. Explorémoslas al tomar en cuenta la naturaleza contractual del *asesoramiento* que prestaba. En esa misión es determinante examinar las funciones y deberes de dos (2) funcionarios administrativos claves en el organigrama municipal, a saber, auditor y tesorero, los cuales a tono con el entonces Art. 44, "desempeñar[ía]n sus cargos por el término para el cual el alcalde hubies[e] sido electo o nombrado, o hasta que sus sustitutos hubieren tomado posesión . . .". 21 L.P.R.A. ant. sec. 1263. Durante ese cuatrienio podrán ser destituidos por justa

causa, previa formulación de cargos.(11) 21 L.P.R.A. ant. sec. 1263.

El inventario de los deberes de un auditor municipal revela que sus funciones giran en torno a las tareas siguientes:

(2) Llevar las cuentas, los registros, libros y récor[d] del municipio.

(3) Registrar y certificar las órdenes de compra y los contratos.

(4) Certificar los comprobantes de pago en cuanto a legalidad, corrección, propiedad y disponibilidad de fondos y emitir los libramientos correspondientes.

(5) Proteger toda la propiedad del municipio y exigir responsabilidad a los funcionarios y empleados bajo cuya custodia y cuidado se encuentre.

(6) Fiscalizar las operaciones y cuentas del tesorero municipal y de otros funcionarios y empleados encargados del cobro y desembolso de fondos municipales y del recibo, la custodia y el despacho de materiales y otra propiedad del municipio. 21 L.P.R.A. ant. sec. 1267.

Por su parte, el tesorero "recaudará y custodiará los dineros y valores pertenecientes al municipio. Hará los pagos de acuerdo con los libramientos expedidos por el secretario auditor y llevará aquellos libros y registros que disponga el reglamento del Secretario de Hacienda, el alcalde o la asamblea municipal. Someterá anualmente a la asamblea municipal la lista de contribuyentes por concepto de patentes de industria y comercio en la cual indicará el volumen de negocios, la clasificación por grupos y el impuesto que corresponde a cada contribuyente". 21 L.P.R.A. ant. sec. 1269.

■ Este inventario de deberes señala que las funciones del secretario auditor y del tesorero municipal implican una

---

(11) Observamos que bajo la nueva Ley Orgánica de los Municipios, están comprendidos expresamente en la categoría de confianza por razón de intervenir, asesorar, responder y prestar servicios directos al alcalde. 21 L.P.R.A. sec. 3352(a).

intervención y asesoramiento directos al Alcalde en la formulación de la política pública que los ubica a ambos en una posición de estricta confianza. Como tal, y para tenencia de sus cargos, puede exigírseles identidad en la afiliación política partidista. *Ramos v. Srio. de Comercio*, 112 D.P.R. 514 (1982). Así lo resolvimos en cuanto al cargo de Secretario Municipal en *Feliciano v. Mun. de Fajardo*, 115 D.P.R. 675 (1984).

La condición de *confianza* de estos dos funcionarios administrativos tiene unas repercusiones en los contratos de Ocasio Carrasquillo.

■ Por la naturaleza de los servicios —asesoramiento en materia fiscal— advertimos que los términos contractuales configuraron una relación profesional que guarda estrecha semejanza con los deberes de esos *funcionarios administrativos* municipales de confianza, cuyos términos expiran al cesar el Alcalde que los nombró. Esta sola razón hubiese sido suficiente para dejar sin efecto el *primer* contrato una vez culminado el período del alcalde saliente García Ortiz. Aquel que contractualmente asesora y aconseja a funcionarios cuyos deberes realmente son de confianza del poder ejecutivo nominador contratante, por equivalencia lógica conceptual y funcional, ostenta ante los ojos de la ley igual categoría.

## IV

Aclarada la cronología fáctica, los perfiles jurídicos de estos contratos y la ausencia de causa de acción por discrimen político, evaluemos los méritos de la acción por persecución maliciosa y, subsiguientemente, la de libelo y calumnia.

■ Resolvemos que las gestiones y comunicaciones desplegadas por el alcalde Rosa Berríos con el fiscal Algarín y la querella ante la Policía están cubiertas por la doctrina de

privilegio restringido. En *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734, 739 (1975), señalamos:

> . . . Un ciudadano que sospeche razonablemente que se ha cometido o que se piensa cometer un crimen tiene el privilegio, para su protección y la de la sociedad, de comunicárselo a las autoridades correspondientes o a quien él crea de buena fe que pueda tomar acción correctiva. La comunicación puede ser falsa, pero el privilegio persiste. *Quiñones* v. *J.T. Silva Banking and Commercial Co.*, 16 D.P.R. 696 (1910); Prosser, *Handbook of the Law of Torts*, 4a ed., West Publishing Co., 1971, págs. 791–794; *New York and Porto Rico S.S. Co.* v. *García*, 16 F.2d 734 (1st. Cir. 1926).
>
> Se pierde la inmunidad si la comunicación se entabla con quien *no existe razón* para creer que puede proteger el interés del actor o de la comunidad, según sea el caso; o si el acto le imparte publicidad exclusiva al asunto; o si el actor se mueve por motivos impropios. *Romany* v. *El Mundo, Inc.*, 89 D.P.R. 604 (1963); *Pueblo* v. *Polo*, 14 D.P.R. 786 (1908); *Pueblo* v. *Rodríguez*, 32 D.P.R. 327 (1923); Prosser, *op. cit.*, 792 *et seq.* El hecho de que otras personas escuchen o lean incidentalmente una comunicación hecha de modo razonable no anula el privilegio. *Quiñones* v. *J. T. Silva Baking and Commercial Co.*, supra. (Énfasis suplido.)

▪ Ciertamente la conducta de Rosa Berríos no encaja como persecución maliciosa. La causa de acción de Ocasio Carrasquillo tenía que cumplir con los requisitos siguientes: (1) que el demandado haya comenzado o continuado un proceso criminal (la norma general es que se trata de pleitos criminales); (2) que haya terminado en favor del acusado (*Parés v. Ruiz*, 19 D.P.R. 342, 346 (1913)), y (3) *que fuera instituido en ausencia de causa probable y con malicia* (*Raldiris v. Levitt & Sons of P.R., Inc.*, 103 D.P.R. 778 (1975)). Como dijimos en *Jiménez v. Sánchez*, 76 D.P.R. 370, 377 (1954):

> La comunidad está interesada en que se investigue y se persiga la comisión de delitos y no deben imponerse penalidades a aquéllos que cooperan en la administración de justicia. Na-

turalmente, existe un destacado interés social en que no se atropelle ni se persiga arbitraria y maliciosamente a los inocentes. Por ello, una acusación caprichosa, formulada de mala fe y sin fundamentos razonables serviría de ingrediente de la acción de persecución maliciosa. Pero una declaración que responda a una creencia razonable no puede conllevar responsabilidad.

En el caso de autos, independientemente de que nunca hubo una denuncia presentada ante un tribunal, no se cumple con el requisito de ausencia de causa probable y malicia. La evidencia revela que el alcalde Rosa Berríos presentó la querella para investigar ante la Policía después de que el fiscal Algarín así lo orientó. Al hacerlo, Rosa Berríos no incurrió en conducta maliciosa ni torticera. Lo único que pretendía era que se investigaran los contratos y pagos municipales a Ocasio Carrasquillo que de su faz se perfilaban como transacciones de dudosa legalidad. Como nuevo ejecutivo municipal tenía perfecto derecho a indagar al respecto, aunque se tratara de un adversario político, el ex alcalde saliente y su asesor contractual Ocasio Carrasquillo. Existían sobradas razones. Veamos.

Según resumida, la prueba demuestra que durante varios meses Ocasio Carrasquillo, como funcionario auditor de la Oficina del Contralor, intervino y auditó los libros del Municipio de Maunabo. Razonablemente debemos presumir que durante esa encomienda oficial advino en conocimiento del estado fiscal y de un sinnúmero de libros y documentos relativos a sus funciones. Además, entró en directo contacto con el alcalde García Ortiz y demás funcionarios administrativos claves.

Una vez renunció a su puesto en la Oficina del Contralor, ofreció sus servicios a ese mismo Alcalde. Suscribió el *primer* contrato el 15 de agosto y el *segundo* el 16 de octubre. Al momento de suscribirse ambos contratos —según hemos visto— la partida municipal en el presupuesto vigente para

sufragar gastos de esta naturaleza estaba reducida a $1,500. Esta cifra representaba el cincuenta por ciento (50%) y estaba congelada por imperativo del Art. 66 de la anterior Ley Municipal, *supra*. Aunque el *primer* contrato era a partir de su otorgamiento, el *segundo* fue con efecto retroactivo e incluía asesoramiento sobre el período en el cual él había intervenido como funcionario del Contralor.

Aun cuando aconsejó al auditor que los contratos fueran registrados en el municipio y remitidos a la Oficina del Contralor en cumplimiento de ley, no hizo ninguna gestión afirmativa para que la ley fuera acatada.

Las circunstancias expuestas —falta de registro de los contratos y su omisión en notificarlos al Contralor— unidas a la dificultad de localizar el segundo contrato, la forma acelerada en que seis (6) días antes de la toma de posesión del nuevo alcalde Rosa Berríos se hace la transferencia en violación de la ley y se ordena el pago de $8,000 para satisfacerle los servicios de Ocasio Carrasquillo, constituyeron suficiente fundamento para que el nuevo incumbente Rosa Berríos iniciara las diversas investigaciones, incluso la querella ante la Policía por recomendación del fiscal Algarín, que intuitivamente detectó "que algo no estaba bien".

## V

Estos hechos y circunstancias tampoco configuran una causa de acción de libelo.

Al examinar este aspecto, debemos recordar que para que prospere tal acción debe probarse que la información difamatoria *sea falsa* y que se causaron unos daños reales. Si se trata de una figura privada, es menester establecer que la imputación fue hecha *negligentemente*, según este concepto es entendido en el campo de derecho de daños y perjuicios. *Oliveras v. Paniagua Diez*, 115 D.P.R. 257 (1984). Ahora bien, si se trata de un funcionario público o figura pú-

blica —*Aponte Martínez v. Lugo*, 100 D.P.R. 282, 293 (1971); *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 422 (1977); *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174 (1978); *Pueblo v. Olivero Rodríguez*, 112 D.P.R. 369 (1982)— es necesario, además, demostrar la *existencia de malicia real*, esto es, que las imputaciones fueron realizadas con un grave menosprecio por la verdad. *Soc. de Gananciales v. López*, 116 D.P.R. 112 (1984); *Oliveras v. Paniagua Diez*, supra; *García Cruz v. El Mundo, Inc.*, supra; *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432 (1977).(12)

Para determinar si Ocasio Carrasquillo es una figura pública seguiremos el enfoque funcional comenzado en *Torres Silva v. El Mundo, Inc.*, supra. En esa misión siempre hemos balanceado los intereses y considerado como eje crítico la importancia e interés público del asunto en controversia. *Zequeira Blanco v. El Mundo Inc.*, supra. En *García Cruz v. El Mundo, Inc.*, supra, pág. 180, sostuvimos que la información con relación a la conducta del allí demandante durante "el período en que aspiró al cargo de alcalde representa[ba]n materia de incuestionable interés público".(13)

En *Pueblo v. Olivero Rodríguez*, supra, pág. 375, al examinar el concepto de figura pública, utilizamos el mismo método evaluativo: el interés público involucrado. Dijimos:

---

(12) Esta dicotomía ha generado intensos debates. Varios artículos analizan las implicaciones de la teoría *figura pública* frente a la de figura privada. J. Naughton, *Comments, Gertz and the Public Figure Doctrine Revisited*, 54 Tul. L. Rev. 1053 (1980). Este autor sostiene que Gertz y los casos posteriores proveen los parámetros necesarios para una buena adjudicación.

Otros han propuesto sus propios criterios al examinar casos como éste. B. Borrus, *Defamation and the First Amendment Protecting Speech on Public Issues*, 56 Wash. L. Rev. 75 (1980). Argumenta que, dada la importancia de las expresiones referentes a asuntos de interés político, debe limitarse al significado de interés público a aquel lenguaje necesario para poder autogobernarse.

(13) Hicimos claro que nuestro pronunciamiento no versaba sobre la regla aplicable cuando se trata de una noticia referente a una conducta *estrictamente privada* de una figura pública, sin interés de regresar a la vida pública, y el derecho a la intimidad pudiera de alguna manera quedar vulnerado al sopesar los valores en conflicto involucrados.

. . . la noción de figura pública está estrechamente vinculada —por razón de la posición oficial, poder o envolvimiento en los asuntos públicos— a la adquisición de relieve, prominencia, fama o notoriedad especial o general en la comunidad que, como corolario, de modo significativo le permite de ordinario a una persona cierto acceso a los medios efectivos de comunicación para exponer, adelantar y debatir sus puntos de vista ante la opinión pública, y como resultado corre el riesgo de estar más expuesta al escrutinio, atención e interés público en contraste con un ciudadano privado.

Un criterio importante en ese análisis fue el factor territorial. "Aunque el concepto tiende a excluir los límites estrechos de un sector exigüo de la comunidad —en el caso de autos, en que el único trasfondo es el residencial Manuel A. Pérez— su vigencia es materia de evaluación casuística, cualitativa y cuantitativamente en función de los factores antes esbozados." (Escolios omitidos.) *Pueblo v. Olivero Rodríguez*, supra, págs. 375–376.

En resumen, nos hemos guiado por ciertas consideraciones *funcionales* al determinar si un reclamante es o no figura o funcionario público a los fines de exigir que se pruebe la malicia real por parte del recurrente.(14)

En el caso de autos, podría argumentarse que Ocasio Carrasquillo voluntariamente y con conocimiento asumió el riesgo de ser un sujeto de un asunto de interés público —aun si de otra manera se trata de una figura privada— al contra-

---

(14) En *Soc. de Gananciales v. López*, 116 D.P.R. 112, 117 (1984), expusimos que debe ponerse menos énfasis "en el análisis abstracto del *status* de la persona afectada como en el contexto específico en que se da la controversia: la naturaleza de la declaración alegadamente difamatoria, el auditorio a que se dirige, los intereses que se sirven o vulneran y la relación funcional entre estos factores".

Entendimos que el interés en el libre flujo de información sobre el proceder de un policía es de tan crítica importancia para el bienestar público que se justifica considerarle "funcionario público" a los fines de aplicar la doctrina de malicia real en casos de difamación.

tar la obligación de rendirle unos servicios de auditoría a varios municipios dispersos territorialmente en la isla, incluso el de Maunabo, a ser sufragados con fondos públicos.

Aun al tomar en cuenta estas consideraciones, para fines argumentativos, partimos del supuesto de que Ocasio Carrasquillo era una figura privada.(15) Concentremos, pues, si hubo negligencia del alcalde Rosa Berríos.

Hemos resumido detalladamente las diligencias del alcalde Rosa Berríos ante el fiscal Algarín y la Policía. También las circunstancias que motivaron su conducta. No podemos concluir que fuera negligente. La actuación de Ocasio Carrasquillo de contratar con el Municipio de Maunabo a raíz de su intervención como funcionario del Contralor, aunque no estrictamente comprendida en el Art. 1 de la Ley Núm. 110 de 12 de mayo de 1943 (3 L.P.R.A. sec. 567)(16) —y,

---

(15) En *Hutchinson v. Proxmire*, 441 U.S. 111 (1979), se sostuvo que el mero hecho de que un investigador científico que recibe fondos públicos y que un senador le dio el premio del mejor despilfarrador de tales fondos, no era una figura pública aun cuando el asunto a discutirse fuera el gasto de fondos públicos. El acceso a los medios noticiosos no era regular y continuo.

En *Wolston v. Readers Digest Ass'n, Inc.*, *et al.*, 439 U.S. 1066 (1979), el Tribunal rechazó el argumento mediante el cual se estableció que aquel que se involucraba en conducta criminal *automáticamente* se convertía en figura pública para propósitos limitados de la convicción en controversia.

(16) "Se declara ilegal el que los funcionarios o empleados del Gobierno de Puerto Rico, después de cesar como tales, actúen como *asesores, consultores o consejeros*, o representen como abogados, agentes, apoderados o *en el ejercicio de cualquier profesión o especialidad, intereses contrarios* a los del Estado Libre Asociado de Puerto Rico, *en aquellos asuntos*, acciones, procedimientos o reclamaciones, *que estuvieron en alguna forma sometidos al conocimiento o resolución de o en trámites ante alguna agencia, oficina* o tribunal del Gobierno de Puerto Rico, mientras dichas personas *fueron funcionarios o empleados* en dicha *agencia, oficina* o tribunal, *y siempre* que dichos funcionarios o empleados *hubieren tenido directa o indirectamente que ver con aquellos asuntos*, acciones, procedimientos o reclamaciones sometidos para resolución o en trámite ante la agencia, oficina o tribunal del Gobierno de Puerto Rico para quien prestase servicios. Se declara asimismo ilegal el que dichos ex empleados o ex funcionarios cooperen en cualquier forma en la preparación o tramitación contra el Estado Libre Asociado de Puerto Rico, de dichos asuntos, acciones, procedimientos o reclamaciones, y el que usen o faciliten el uso contra el Estado Libre Asociado de

por ende, no susceptible de ser sancionada penalmente— fue contraria al espíritu de buena moral pública que veda toda acción de conflictos de intereses. Véase *In re Ríos*, 112 D.P.R. 353 (1982).

■ También, a la luz de las conclusiones del Informe de la Administración de Servicios Municipales, NAGF 23–81, la contratación y desembolsos de fondos públicos sumarios, la omisión en registrar los contratos y su notificación al Contralor representaron suficientes motivos para el alcalde Rosa Berríos pedir una investigación y plantear públicamente la interrogante de ese conflicto de intereses y la legalidad de las transacciones. En el sustrato, sus señalamientos públicos estuvieron fundados en la verdad. El contenido de su *Mensaje al Pueblo* no fue difamatorio ni trascendió los límites jurídicos permisibles de la función informativa y crítica en cuanto a la anterior obra de gobierno del ex alcalde García Ortiz.

Respecto a la noticia publicada por *El Vocero*, los antecedentes fácticos demuestran que en su génesis no estuvieron presentes los elementos malicia y negligencia. La gestión del alcalde Rosa Berríos con el fiscal Algarín y la Policía fue legítima y razonable. La forma en que fue escrita y la prominencia que dicho rotativo le dio es materia adjudicativa fuera de nuestra jurisdicción. Después de todo, Ocasio Carrasquillo y su esposa desistieron de su acción contra ese periódico.

## VI

Una vez dictaminado que ni el alcalde Rosa Berríos ni el Municipio actuaron maliciosa, libelosa o negligentemente, y decretada la nulidad de los contratos por los cuales cobró

---

Puerto Rico de informaciones de hecho obtenidas mientras fueron funcionarios o empleados. (Énfasis suplido.) 3 L.P.R.A. sec. 567.

Ocasio Carrasquillo en exceso de los fondos legalmente disponibles en el Presupuesto Fiscal 1980–1981, procede: (1) revocar el dictamen del foro de instancia imponiéndole a los primeros responsabilidad y (2) declarar con lugar la reconvención interpuesta. La doctrina de enriquecimiento injusto no es de aplicación al caso de autos. *Morales v. Mun. de Toa Baja*, supra. En consecuencia, Ocasio Carrasquillo deberá satisfacer al Municipio de Maunabo la suma total de $7,000, intereses legales, más las costas del proceso, y $1,000 de honorarios de abogado.

*Se dictará la correspondiente sentencia.*

La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Hernández Denton concurren con el resultado sin opinión escrita.