| Genesis Security Services, Inc.<br><br>Recurrida<br><br>v.<br><br>Departamento del Trabajo y Recursos Humanos; Estado Libre Asociado de Puerto Rico<br><br>Peticionarios | Certiorari<br><br>2020 TSPR 84<br><br>204 DPR \_\_\_\_ |

Número del Caso: CC-2019-360

Fecha: 18 de agosto de 2020

Tribunal de Apelaciones:

    Región Judicial de San Juan y Fajardo, Panel III

Oficina del Procurador General:

    Lcdo. Isaías Sánchez Báez
    Procurador General

    Lcdo. Eric O. De La Cruz Iglesias
    Procurador General Auxiliar

Materia: Derecho Administrativo: En los contratos de selección múltiple de la Administración de Servicios Generales, no se requiere que, luego de la otorgación de un contrato entre la Administración y el contratista, se celebre obligatoriamente un contrato posterior entre la entidad gubernamental y el proveedor del bien o servicio, sino que basta emitir una orden de compra. No obstante, ello no es óbice para que las partes pacten protecciones adicionales para dar inicio a la vigencia del contrato entre el contratista y la agencia.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Génesis Security Services, Inc.<br><br>Recurrida<br><br>v.<br><br>Departamento del Trabajo y Recursos Humanos; Estado Libre Asociado de Puerto Rico<br><br>Peticionarios | CC-2019-0360 | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ.

San Juan, Puerto Rico, a 18 de agosto de 2020.

En múltiples ocasiones, este Tribunal ha tenido la necesidad de pautar en torno a diversas controversias relacionadas con la contratación gubernamental ordinaria, donde típicamente una entidad gubernamental y un suplidor suscriben directamente un contrato. En esta ocasión, nos enfrentamos a una modalidad contractual distinta, en la cual la Administración de Servicios Generales celebra una subasta y suscribe un contrato de selección múltiple con distintos licitadores cualificados, los cuales eventualmente pueden ser seleccionados como contratistas por diversas entidades del Gobierno de Puerto Rico. Con ello en mente, procede pautar si nuestro ordenamiento jurídico requiere algún procedimiento formal ulterior al

contrato de selección múltiple, a saber: una orden de compra o un contrato directo entre la agencia pública y el contratista. Veamos.

I

El 23 de diciembre de 2015, la corporación Génesis Security Services, Inc. (Génesis) presentó una demanda de cobro de dinero en contra del Departamento del Trabajo y Recursos Humanos (Departamento del Trabajo) y el Gobierno de Puerto Rico. Génesis alegó que, durante los últimos doce (12) años, había obtenido la buena pro en una subasta de servicios de vigilancia celebrada por la Administración de Servicios Generales (Administración). A raíz de lo anterior, explicó que Génesis y la Administración otorgaron un contrato titulado Contrato Número 13-01C de Selección Múltiple para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico (Contrato de Selección Múltiple). Expresó que, en el mismo, se cualificó a Génesis y a otros licitadores agraciados a rendir servicios de vigilancia a entidades del Gobierno de Puerto Rico. El referido contrato estuvo vigente desde el 25 de septiembre de 2012 hasta el 24 de septiembre de 2015.

Génesis indicó que, en virtud del Contrato de Selección Múltiple, el Departamento del Trabajo utilizó sus servicios de vigilancia por aproximadamente doce (12) años. Sin embargo, alegó que el Departamento del Trabajo no emitió pago alguno por los servicios provistos por Génesis durante el año fiscal 2013-2014. Ello, a pesar de

que el Departamento del Trabajo regularmente solicitaba sus servicios por escrito y de que Génesis los facturó adecuadamente.

No obstante, Génesis reconoció que no suscribió un contrato directamente con el Departamento del Trabajo para el año en controversia. A esos fines, adujo que ello no fue necesario debido a que la legislación, los reglamentos y las cartas circulares aplicables no lo requerían. Génesis indicó que la Administración fue creada para centralizar el procedimiento de las compras gubernamentales y que los contratos de selección múltiple permitían agilizar y facilitar dicho proceso. Por tanto, sostuvo que del derecho aplicable se desprendía que, una vez la Administración celebra un contrato para cualificar a ciertos licitadores agraciados para proveer servicios al Gobierno, las agencias interesadas en utilizar los mismos sólo debían emitir una orden de compra con ese propósito. A raíz de lo anterior, señaló que no estaba obligada a celebrar un segundo contrato directamente con el Departamento del Trabajo.

Debido a lo anterior, Génesis solicitó al Tribunal de Primera Instancia que ordenara al Departamento del Trabajo a emitir la orden de compra correspondiente y que pagara por los servicios rendidos. Sostuvo que la deuda del Departamento del Trabajo ascendía a $1,798,000.34, más $43,186.75 en intereses acumulados.

Por su parte, el Departamento del Trabajo solicitó la desestimación de la demanda, pues alegó que la misma no

expuso una reclamación que justificara la concesión de un remedio. Así, arguyó que el Contrato de Selección Múltiple celebrado entre la Administración y Génesis no obligaba al Departamento del Trabajo. Asimismo, señaló que Génesis y el Departamento del Trabajo no suscribieron un contrato entre ellos durante el año fiscal 2013-2014. En consideración a la doctrina de contratación gubernamental, el Departamento del Trabajo aseveró que no se podía validar el reclamo de Génesis. Por tanto, concluyó que Génesis erró al continuar proveyendo sus servicios sin la celebración de un segundo contrato.

Ante ello, Génesis se opuso y alegó que una desestimación en esa etapa era improcedente. Adujo que aún no se había presentado la prueba necesaria para aquilatar las controversias de hecho del caso y que, de darse por ciertas las alegaciones de la demanda, ésta tenía derecho a un remedio. De igual modo, Génesis reiteró que el Departamento del Trabajo solicitó sus servicios, en virtud del Contrato de Selección Múltiple, por lo que no era necesaria la celebración de un segundo contrato.

Sin embargo, Génesis anejó a su moción una copia del Contrato de Selección Múltiple. En el mismo, se especificaba que toda entidad gubernamental interesada en adquirir los servicios de Génesis o de cualquier otra compañía de vigilancia debía suscribir un segundo contrato directamente con los licitadores agraciados. Según el Contrato de Selección Múltiple: "**[l]as agencias perfeccionarán un contrato con la Compañía de Vigilancia**

**seleccionada**, este proceso es lo que dará inicio a la vigencia del contrato entre el contratista y la agencia peticionaria".[1] Además, Génesis anejó una copia de otro contrato de selección múltiple pactado entre la Administración y Génesis, el cual estuvo vigente durante los tres (3) años anteriores al Contrato de Selección Múltiple ante nuestra consideración. En ese contrato anterior, las partes se obligaron a los mismos términos y condiciones que en el Contrato de Selección Múltiple que nos ocupa, incluyendo el requerimiento de otorgar un segundo contrato directamente entre la entidad gubernamental y el licitador agraciado.[2]

Por otro lado, el Departamento del Trabajo presentó una réplica en la cual reiteró la obligatoriedad de la celebración de un segundo contrato. Particularmente, sostuvo que los principios de contratación gubernamental impedían el reconocimiento retroactivo de una obligación que no se redujo a escrito. Al igual que Génesis, anejó a su moción el Contrato de Selección Múltiple.

Por su parte, Génesis presentó una dúplica en la cual alegó que no había controversia sobre la existencia de un contrato válido, vigente y vinculante, pues el Contrato de Selección Múltiple cumplió con todos los requisitos de contratación gubernamental. Destacó que el Departamento

---

[1](Énfasis en el original). Apéndice de <u>certiorari</u>, <u>Instrucciones sobre uso del Contrato Número 13-01C de Selección Múltiples para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico</u>, pág. 19.

[2]El contrato anterior se titula <u>Contrato Número 10-7C-227 de Selección Múltiple para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico</u>.

del Trabajo solicitó y recibió los servicios de Génesis por muchos años en virtud de ese contrato. Por tanto, señaló que el Departamento del Trabajo conocía que el derecho aplicable solo exigía que se emitiera una orden de compra. Según Génesis, una orden de compra era un documento administrativo e interno de las agencias gubernamentales que no era un requisito previo a la contratación. A raíz de ello, alegó que no había impedimento alguno para que el Departamento del Trabajo emitiera una orden de compra para que procediera el pago por los servicios provistos en el año fiscal 2013-2014. Debido a lo anterior, solicitó que el foro primario denegara la moción de desestimación.

Ante este cuadro, el Tribunal de Primera Instancia atendió la moción de desestimación presentada por el Departamento del Trabajo como una solicitud de sentencia sumaria. Ello, pues concluyó que el Departamento del Trabajo presentó materias no contenidas en la alegación impugnada con evidencia suficiente para apoyarlas. A través de ese estándar, el foro primario desestimó la demanda, aunque por fundamentos distintos a los presentados por las partes.

Específicamente, Tribunal de Primera Instancia reconoció que el Contrato de Selección Múltiple disponía que las agencias interesadas en utilizar los servicios de las compañías de vigilancia cualificadas por la Administración debían otorgar un contrato directo con el licitador agraciado. Sin embargo, determinó que la Carta

Circular Núm. 2014-14, infra, emitida por la Administración con posterioridad a la celebración del Contrato de Selección Múltiple, precisaba que ello no era necesario. En consecuencia, resolvió que, una vez la Administración adjudicó la subasta a favor de Génesis y suscribió un contrato con ésta, el Departamento del Trabajo no tenía que suscribir un contrato directamente con Génesis.

Ahora bien, el foro primario determinó que, a pesar de que un segundo contrato no era necesario, el derecho aplicable sí exigía que el Departamento del Trabajo emitiera una orden de compra. El Tribunal de Primera Instancia interpretó que, mediante una orden de compra, nacía propiamente una obligación entre el Departamento del Trabajo y Génesis. Debido a que el Departamento del Trabajo no emitió una orden de compra a esos fines, resolvió que no procedía el desembolso de los fondos solicitados por Génesis. Además, el foro primario concluyó que el Departamento del Trabajo no podía emitir una orden de compra en esa etapa, pues constituiría una obligación retroactiva contraria a las normas de contratación gubernamental. A la luz de esos fundamentos, el Tribunal de Primera Instancia desestimó la demanda presentada por Génesis.

Insatisfecha, Génesis acudió al Tribunal de Apelaciones mediante un recurso de apelación. En el mismo, Génesis arguyó que el foro primario erró al determinar que una orden de compra era un requisito constitutivo de los

contratos gubernamentales. En esa línea, insistió en que las órdenes de compra eran documentos internos de las agencias que no eran necesarios para la exigibilidad de una obligación. En la alternativa, reiteró que el Departamento del Trabajo solicitó consecuentemente por escrito los servicios de Génesis. A raíz de ello, arguyó que no se debió desestimar la demanda en esa etapa, pues restaba pasar prueba en torno a esos requerimientos para determinar si éstos constituían una orden de compra, conforme al derecho aplicable.

Por otra parte, el Departamento del Trabajo se opuso y arguyó que el foro primario actuó correctamente al desestimar sumariamente el pleito. Ello, pues no había controversia en torno al Contrato de Selección Múltiple, a los servicios provistos por Génesis durante el año fiscal 2013-2014 y a la inexistencia de una orden de compra emitida a esos fines. Debido a lo anterior, alegó que Génesis no tenía derecho a remedio alguno, pues no se podía emitir una orden de compra retroactivamente.

Ponderados los argumentos de las partes, el Tribunal de Apelaciones revocó la sentencia del Tribunal de Primera Instancia. En esencia, el foro apelativo sostuvo que el foro primario no tuvo ante sí todos los hechos necesarios para adjudicar la controversia. Particularmente, resolvió que subsistían las siguientes controversias de hecho que impedían la desestimación sumaria del pleito: ¿administra o no la Administración el Contrato de Selección Múltiple? ¿qué efecto tiene la Carta Circular emitida en el último

mes del año fiscal 2013-2014 sobre la prestación de servicios de Génesis durante ese mismo período? ¿en qué consiste la referida orden de compra: es un formulario unilateral o bilateral? ¿la orden constituye un requisito formal de la contratación gubernamental, capaz de frustrar una reclamación de cobro de dinero? ¿es un mecanismo interno para fines de controles fiscales? ¿es subsanable su incumplimiento?[3] Ante este dictamen, el Departamento del Trabajo presentó una moción de reconsideración, la cual el foro apelativo declaró no ha lugar.

Luego de varios trámites relacionados a la paralización automática del pleito en virtud de la Puerto Rico Oversight, Management, and Economic Stability Act, 48 USC sec. 2101 et seq., que no son necesarios reseñar extensamente, el Departamento del Trabajo comparece ante este Tribunal mediante un recurso de certiorari.[4] En esencia, arguye que, ante la falta de una controversia real y material de hechos, el Tribunal de Apelaciones debió revisar las conclusiones de derecho del Tribunal de Primera Instancia. Además, impugnó que el Tribunal de Apelaciones considerara que se debía pasar prueba sobre los requerimientos escritos que alegadamente hizo en solicitud de los servicios de Génesis. Ello, pues alegó

---

[3]Apéndice de certiorari, Sentencia, pág. 194.

[4]El 15 de febrero de 2019 la Jueza Laura Taylor Swain aprobó un acuerdo entre Génesis Security Services, Inc. (Génesis) y el Gobierno de Puerto Rico, mediante el cual se levantó la paralización automática del pleito y se permitió la continuación de los procedimientos. Apéndice de certiorari, Eighth Omnibus Order Granting Relief from the Automatic Stay, pág. 251.

que Génesis levantó ese argumento por primera vez a nivel apelativo.[5]

Por su parte, comparece Génesis y reitera los argumentos elaborados ante los foros recurridos. A su vez, arguye que la moción de desestimación presentada por el Departamento del Trabajo no se debió adjudicar conforme al estándar de sentencia sumaria.

El 28 de junio de 2019, el Pleno de este Tribunal acordó expedir el recurso ante nuestra consideración. Con el beneficio de la comparecencia de las partes, este Tribunal procede a resolver la controversia ante nos.

## II

### A.

La Constitución de Puerto Rico establece que "sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Art. VI, Sec. 9, Const. PR., LPRA, Tomo 1. En virtud de este mandato constitucional, hemos sido consecuentes al exigir el manejo ético y apropiado de los fondos públicos. Vicar Builders v. ELA et al., 192 DPR 256 (2015); Rodríguez Ramos et al. v. ELA et al., 190 DPR 448 (2014); Jaap Corp. v. Depto. Estado et al., 187 DPR 730 (2013).

_____

[5]De un estudio del expediente se desprende que tal contención no es correcta. Desde la demanda, Génesis alegó que el Departamento del Trabajo y Recursos Humanos (Departamento del Trabajo) solicitó los servicios de ésta por escrito. Apéndice de certiorari, Demanda, pág. 86. Así lo reiteró Génesis consecuentemente en otros documentos presentados ante los foros judiciales. Véase, Apéndice de certiorari, Dúplica a réplica a oposición a moción en solicitud de desestimación a tenor con la R. 10.2 de las de Procedimiento Civil, pág. 116.

Ello, en miras de que "[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa". Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 DPR 864, 871 (1990).

A esos fines, la Asamblea Legislativa ha desarrollado un andamiaje de distintos estatutos que tienen como propósito garantizar el control fiscal y regular la contratación gubernamental. Vicar Builders v. ELA et al., supra, pág. 262. De igual modo, este Tribunal ha afinado los preceptos de una sana administración pública mediante nuestra jurisprudencia. Jaap Corp. v. Depto. Estado et al., supra, pág. 741. En consecuencia, la facultad del Gobierno de Puerto Rico y de sus entidades para contratar y comprometer fondos públicos está limitada por estas normas.

A la luz de lo anterior, hemos determinado que todo contrato gubernamental debe cumplir con los requisitos siguientes: (1) reducirse a escrito; (2) mantener un registro que establezca su existencia; (3) remitir copia a la Oficina del Contralor de Puerto Rico, y (4) acreditar que se realizó y otorgó quince días antes. ALCO Corp. v. Mun. de Toa Alta, 183 DPR 530, 537 (2011); Ocasio v. Alcalde Mun. de Maunabo, 121 DPR 37, 54 (1988). Los contratos gubernamentales deben cumplir rigurosamente con cada una de estas exigencias, "ya que sirven como

mecanismo de cotejo para perpetuar circunstancial y cronológicamente esos contratos y, así, evitar pagos y reclamaciones fraudulentas". Vicar Builders v. ELA et al., supra, pág. 264.

De otra parte, como norma general, el Departamento de Hacienda de Puerto Rico (Departamento de Hacienda) tiene la responsabilidad de diseñar y administrar los sistemas de contabilidad y los procedimientos de pago e ingresos de las dependencias y entidades gubernamentales. Ley de Contabilidad del Gobierno de Puerto Rico, Ley Núm. 230 de 23 de julio de 1974, 3 LPRA sec. 283 et seq. En el ejercicio de estas funciones, el Gobierno de Puerto Rico preinterviene en todas las transacciones financieras de sus dependencias públicas, con el propósito de garantizar su exactitud, corrección, necesidad y legalidad. 3 LPRA sec. 283e. No obstante, ello no aplica a la Administración. Expresamente, se dispone en tal estatuto que "toda compra o adquisición de bienes o servicios no profesionales realizada por o a través de la Administración de Servicios Generales estará exenta de este proceso". Íd. En consecuencia, el Departamento de Hacienda delegó en la Administración este deber de supervisar y de fiscalizar las transacciones de compra y adquisiciones, bajo su competencia, de las entidades de la Rama Ejecutiva.

**B.**

La Administración fue creada con el propósito de centralizar el proceso de compra y adquisición de las entidades de la Rama Ejecutiva. Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011, Ley Núm. 3-2011, 3 LPRA Ap. XIX, Art. 2.[6] Ello, pues "se encontró que en la actualidad la mayoría de las agencias realizan sus compras de forma separada lo cual implica que hay una duplicidad en las funciones". Informe positivo sobre Plan de Reorganización Núm. 11 Administración de Servicios Generales, Comisión de Gobierno, Cámara de Representantes, 24 de junio de 2011, 5ta Ses. Ord., 16ta Asam. Leg., en la pág. 3. A la luz de lo anterior, se determinó que la Administración tramitaría las adquisiciones y compras de las agencias públicas, en pro de facilitar, uniformar y agilizar dichos procedimientos. En esa encomienda, la Administración funge como "un ente negociador y facilitador, y como enlace entre las agencias y suplidores". 3 LPRA Ap. XIX, Art. 22.

El Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011, supra, establece que, de ordinario, todas las entidades y agencias de la Rama Ejecutiva tienen que realizar sus compras a través de la Administración. 3 LPRA Ap. XIX,

---

[6]Recientemente, el Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011, Ley Núm. 3-2011, 3 LPRA Ap. XIX, fue derogado por la Ley de la Administración de Servicios Generales para la Centralización de las compras del Gobierno de Puerto Rico de 2019, Ley Núm. 73-2019, http://www.oslpr.org/2017-2020/leyes/pdf/ley-73-23-Jul-2019.pdf. Sin embargo, el estatuto no presenta cambios sustanciales en torno a la controversia ante nuestra consideración.

Arts. 3 y 26. No obstante, hay entidades particulares que no están obligadas a tramitar las mismas mediante la Administración.[7] Ahora bien, ello no implica que esas agencias exentas de la Rama Ejecutiva y las demás entidades gubernamentales no pueden beneficiarse de las adquisiciones realizadas por la Administración. Al contrario, tienen "la opción de acogerse y beneficiarse de forma voluntaria de los sistemas que habrán de desarrollarse para adquirir bienes, servicios profesionales y servicios no profesionales" elaborados por la Administración. 3 LPRA Ap. XIX, Art. 3. En esas ocasiones, las entidades compradoras deberán cumplir con la normativa aplicable a los procedimientos ejecutados por la Administración.

De igual modo, la Asamblea Legislativa le delegó expresamente a la Administración la responsabilidad de establecer, mediante reglamento, las normas y los mecanismos necesarios para efectuar las compras y adquisiciones. 3 LPRA Ap. XIX, Art. 23. El Reglamento de Adquisición de la Administración de Servicios Generales, Reglamento Núm. 3381, Administración de Servicios Generales, 24 de noviembre de 1986, (Reglamento de Adquisición), dispone que toda adquisición que haga la Administración se realizará mediante alguno de los procedimientos siguientes: (1) subasta formal; (2) subasta

---

[7]Específicamente, la Ley Orgánica del Departamento del Trabajo y Recursos Humanos de Puerto Rico, Ley Núm. 15 de 14 de abril de 1931, 3 LPRA sec. 308a, dispone que el Departamento del Trabajo no está obligado a realizar sus compras a través de la Administración.

informal; (3) mercado abierto, o (4) procedimientos especiales. Íd., Art. 64. En el caso de las subastas formales, que es el procedimiento que nos ocupa, las mismas procederán cuando se adquiera un bien, obra o servicio que exceda de $4,000, cuando se trate de una obra de construcción que exceda de $25,000 o de un servicio anexo a ésta que exceda de $10,000. Íd., Art. 65.

El Reglamento de Subastas de la Administración de Servicios Generales, Reglamento Núm. 3380, Administración de Servicios Generales, 24 de noviembre de 1986, (Reglamento de Subastas), provee que, la Administración celebrará las subastas formales en beneficio de las dependencias de la Rama Ejecutiva. Íd., Art. 3. En esa tarea, la Administración publicará un pliego de subasta, en el cual se expondrán las condiciones y especificaciones que los licitadores interesados deberán cumplir. Íd., Art. 32. Al adjudicar la subasta, se otorgará un contrato entre la Administración y el licitador agraciado o los licitadores agraciados, con el propósito de cualificar a éstos para proveer servicios a cualquier entidad o dependencia de la Rama Ejecutiva. Íd., Art. 75.

A esos fines, el Reglamento de Subastas, supra, dispone lo siguiente:

> La oferta del licitador agraciado, en el pliego de la subasta[,] constituye el contrato entre las partes y junto a los demás requisitos de forma de los contratos en el Gobierno constituirán el expediente del contrato, el cual se mantendrá en la Oficina. A dicho expediente se le unirán las **copias de las órdenes emitidas contra dicho contrato.** Por cada licitador agraciado, habrá un expediente de contrato. (Énfasis suplido). Íd., Art. 75.

Como puede apreciarse, se presupone que se emitirán órdenes de compra contra el contrato resultante de la subasta celebrada. Abundemos, pues, sobre el concepto de órdenes de compra contra contrato. Veamos.

El Reglamento de Adquisición, supra, establece que, una vez se celebra una subasta formal y la Administración cualifica a un licitador mediante contrato, las entidades gubernamentales interesadas en adquirir los servicios pactados lo harán mediante un mecanismo llamado "compra directa contra contrato". Íd., Art. 69. En esencia, una compra directa consiste en que una agencia pública emite **"una orden de compra contra el contrato vigente"** pactado entre la Administración y el licitador agraciado. (Énfasis suplido). Íd. De este modo, se le notifica al licitador agraciado que esa entidad gubernamental utilizará sus servicios. Así lo reitera el Reglamento de Adquisición, supra, el cual provee lo siguiente: "[l]os contratos se otorgan como culminación de cualquier procedimiento de adquisición en el Gobierno. **Las compras o requerimientos que contra ellos se efectúen se harán mediante expedición de órdenes"**. Íd., Art. 87.

Las compras directas, como norma general, "se hacen **directamente sin la intervención de la Administración,** mediante la expedición de una orden de compra contra el contrato vigente".[8] (Énfasis suplido). Íd., Art. 69. El

_____

[8] A modo de excepción, la Administración de Servicios Generales (Administración) tendrá la responsabilidad de emitir órdenes de compra en los casos particulares en que la propia Administración es la que maneja directamente el

Reglamento de Adquisición, supra, precisa que las personas facultadas para emitir las referidas órdenes de compra son los llamados Delegados o Sub-delegados Compradores, quienes son empleados de la entidad gubernamental autorizados expresamente para ejercer tal responsabilidad. Íd. Véase también, Reglamento de Delegados Compradores de la Administración de Servicios Generales, Reglamento Núm. 3383, Administración de Servicios Generales, 24 de noviembre de 1986, (Reglamento de Delegados Compradores).

Antes de emitir cualquier orden de compra con estos propósitos, los Delegados o Sub-delegados Compradores tienen la responsabilidad de corroborar que la agencia cuente con los fondos necesarios para ello. Reglamento de Delegados Compradores, supra, Art. 32. Las órdenes de compra "se emiten utilizando el formulario provisto para ello, asegurándose de cumplimentarlo completo y adecuadamente, conteniendo las especificaciones, condiciones, términos, certificación de fondos y demás información necesaria". Reglamento de Adquisición, supra, Art. 69. Una vez suscrita la orden de compra, se dirige al

_____

contrato. Así se especifica en la Carta Circular Núm. 2014-14, publicada por la Administración el 25 de junio de 2014, al proveer lo siguiente: "[e]n ese proceso de selección, el Delegado o Subdelegado Comprador de la agencia o dependencia peticionaria puede realizar diversos tipos de compras, entre otras, compras directas contra contratos, **excepto contra aquellos contratos que administra directamente la [Administración]**". (Énfasis en el original). De igual modo, la Carta Circular Núm. 2014-14, supra, especifica los contratos que la Administración manejaba directamente al momento de los hechos ante nuestra consideración. El Contrato Número 13-01C de Selección Múltiple para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico otorgado entre la Administración y Génesis Security, Inc. **no** se encontraba entre éstos.

licitador agraciado y se notifica al receptor oficial de la agencia, al encargado de la propiedad, al Delegado o Sub-delegado Comprador, al Jefe de Finanzas de la agencia, al Departamento de Hacienda y a la Administración. Reglamento de Adquisición, supra, Art. 69; Reglamento de Delegados Compradores, supra, Art. 33.

El esquema antes descrito se resume acertadamente en la Carta Circular Núm. 2014-14, publicada por la Administración el 25 de junio de 2014, del modo siguiente:

> Como vemos, una vez la Junta de Subastas emite su Aviso de Adjudicación, la [Administración] procede a suscribir el contrato de cualificación con los diversos licitadores agraciados en la subasta o procedimiento de que se trate y la agencia, corporación pública o municipio que desee beneficiarse de los precios y condiciones licitados en la subasta selecciona, de entre los licitadores agraciados, a aquél que mejor supla sus necesidades particulares.

> En ese proceso de selección, el Delegado o Subdelegado Comprador de la agencia o dependencia peticionaria puede realizar diversos tipos de compras, entre otras, compras directas contra contratos . . . El contrato vigente es aquel contrato de cualificación que se formaliza entre la [Administración] y el postor agraciado. La referida orden de compra se emite utilizando el formulario provisto para ello, asegurándose el Delegado o Subdelegado Comprador de cumplimentarla completa y adecuadamente. Ésta debe contener, entre otras cosas, las especificaciones del bien a adquirirse, el precio, los términos de la entrega, condiciones, certificación de fondos y debe estar firmada por los funcionarios autorizados.

> Conforme a lo señalado, la adquisición de bienes y servicios no profesionales, a través de las subastas y demás mecanismos realizados por la [Administración], se tramitan por conducto de órdenes de compra. **Nuestra ley orgánica y el Reglamento de Adquisición, supra, no requieren, como condición previa al servicio y al posterior pago, que entre la agencia o dependencia peticionaria y suplidor agraciado se otorgue otro**

**contrato. Sólo se requiere que la subasta o el procedimiento de adquisición realizado esté vigente y que la agencia o dependencia peticionaria emita una orden de compra contra el contrato de cualificación otorgado entre la [Administración] y el postor agraciado.** Una vez la agencia o dependencia peticionaria emite la orden de compra contra el contrato de cualificación es que nace la obligación contractual entre la agencia o dependencia peticionaria y el suplidor del bien o servicio. (Énfasis suplido).

Asimismo, este andamiaje ha sido aprobado y validado directamente por la Asamblea Legislativa. El Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011, supra, provee que todo procedimiento de adquisición y compra tiene que cumplir con una serie de estatutos, entre éstos, la Ley de Contratos de Selección Múltiple en los Procesos de Compras, Ley Núm. 253-2006, 3 LPRA sec. 8661 et seq. Esta ley, en su exposición de motivos, validó lo siguiente:

En la reglamentación de compras de la Administración de Servicios Generales, se dispone que los contratos de selección múltiple se otorguen a varios licitadores a la vez, de suerte que las agencias peticionarias expidan las órdenes de compra contra el renglón y licitador que más adecuadamente reúna las especificaciones requeridas por parte de ellas. Ley de Contratos de Selección Múltiple en los Procesos de Compras, Ley Núm. 253-2006, (Tomo 2) 2006 LPR 1317.

Así, se caracterizó este mecanismo de compra como uno "altamente útil y participativ[o]". Íd.

En consideración al marco jurídico enunciado, procedemos a resolver la controversia ante nos.

**III**

Como cuestión de umbral, debemos resolver si, una vez la Administración cualifica a un licitador agraciado para

proveer bienes o servicios al Gobierno de Puerto Rico mediante contrato, las entidades gubernamentales interesadas en recibir los mismos están obligadas a celebrar un segundo contrato directamente con el licitador o si basta emitir una orden de compra con ese propósito. Veamos.

Como expusimos anteriormente, la Administración es la entidad responsable de tramitar las compras y las adquisiciones de las entidades de la Rama Ejecutiva. Para ello, la Administración podrá tramitar la adquisición de bienes o servicios de distintas maneras, entre ellas, mediante el procedimiento de subasta formal. Reglamento de Adquisición, supra, Art. 64. Luego de que la Administración adjudica una subasta y otorga un contrato con el licitador o licitadores agraciados, las agencias públicas pueden beneficiarse de los servicios cualificados a través de un procedimiento de "compra directa contra contrato". Íd., Art. 69. La compra directa contra contrato es, precisamente, la emisión de una orden de compra mediante la cual la dependencia gubernamental solicita los bienes o servicios al licitador agraciado.

En consecuencia, como puede apreciarse, los estatutos y reglamentos reseñados **no** exigen que, luego de la otorgación de un contrato entre la Administración y un licitador agraciado, se celebre **obligatoriamente** un contrato posterior entre la entidad pública y el proveedor del bien o servicio. Al contrario, la normativa aplicable

valida expresamente que se emita únicamente una orden de compra con esos propósitos.

No obstante, es menester destacar que, en este procedimiento de adquisición directa mediante emisión de orden de compra, se exige el cumplimiento de ciertas garantías, en miras de proteger el fisco y el interés público. Por ejemplo, en estos casos, es imprescindible que exista un contrato válido y exigible entre la Administración y el licitador agraciado que cumpla con todos los requisitos de contratación gubernamental de nuestro ordenamiento. Así lo exige el Art. 69 del Reglamento de Adquisición, supra, el cual provee que las compras directas mediante órdenes de compra sólo proceden en casos en los que haya un contrato vigente entre la Administración y el licitador agraciado. De igual modo, el Art. 36 del Reglamento de Delegados Compradores, supra, prohíbe que los Delegados o Sub-delegados Compradores suscriban órdenes de compra previo a la formalización de un contrato. Por tanto, la normativa antes descrita no valida que las dependencias gubernamentales emitan órdenes de compra en un vacío. Ello, laceraría los firmes principios de sana administración pública reiterados consecuentemente por este Tribunal.

De igual modo, las normas de la Administración contemplan que toda orden de compra a estos fines se emita **antes** de que se realicen los servicios por el licitador agraciado, para así evitar que se contrate retroactivamente. Debido a lo anterior, no existe una

obligación propiamente entre la entidad gubernamental y el licitador agraciado hasta que se otorgue una orden de compra. Tal como se expone en la Carta Circular 2014-14, supra: "[u]na vez la agencia o dependencia peticionaria **emite la orden de compra** contra el contrato de cualificación **es que nace la obligación contractual** entre la agencia o dependencia peticionaria y el suplidor del bien o servicio". (Énfasis suplido). Mediante esta norma, se promueve un mayor control fiscal en el desembolso de fondos públicos de parte de las agencias gubernamentales. Además, lo anterior es cónsono con el principio básico de nuestro ordenamiento que prohíbe todo intento de contratación retroactiva en el ámbito gubernamental. Jaap Corp. v. Depto. Estado et al., supra, pág. 748.

Ahora bien, en el caso ante nuestra consideración, las partes pactaron protecciones adicionales a las contempladas por las normas de la Administración. Como expusimos anteriormente, en el Contrato de Selección Múltiple otorgado entre la Administración y Génesis, las partes acordaron que: "**[l]as agencias perfeccionarán un contrato con la Compañía de Vigilancia seleccionada**, este proceso es lo que dará inicio a la vigencia del contrato entre el contratista y la agencia peticionaria".[9] De igual modo, el contrato especifica lo siguiente: "**[t]an pronto este proceso [s]e formalice, los Delegados o Subdelegados**

---

[9](Énfasis en el original). Apéndice de certiorari, Instrucciones sobre uso del Contrato Número 13-01C de Selección Múltiples para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico, pág. 19.

**Compradores podrá[n] emitir orden de compra**".[10] De hecho, Génesis presentó ante los foros primarios una copia del contrato que estuvo vigente antes que el Contrato de Selección Múltiple, mediante el cual la Administración y Génesis acordaron, de igual forma, que toda agencia interesada en obtener los servicios de Génesis tendría que celebrar un contrato directamente con ésta.

Así, se desprende que Génesis pactó expresamente, en más de una ocasión, que las entidades gubernamentales interesadas en obtener sus servicios de vigilancia tendrían que celebrar un contrato con ésta. Más aún, el Contrato de Selección Múltiple especifica que la otorgación de ese contrato es necesaria para la posterior emisión de una orden de compra. Por tanto, a pesar de que la Administración y Génesis no estaban obligados a ello, éstas **voluntariamente** acordaron que las dependencias gubernamentales interesadas en los servicios de Génesis tendrían que otorgar un contrato directamente con ésta.

Este pacto voluntario y deliberado de exigir más requisitos de los contemplados por los estatutos y reglamentos de la Administración no es ilegal, inmoral ni contrario al orden público. Ciertamente, las normas promovidas por la Administración no exigen el otorgamiento de un contrato entre la entidad gubernamental y el licitador agraciado. Sin embargo, ello no es óbice para que las partes pacten protecciones adicionales, con el propósito de promover la administración más eficiente y

---

[10](Énfasis suplido). Íd.

ética de los fondos públicos. Ello, es cónsono con nuestros pronunciamientos en torno a la contratación gubernamental. Así lo reconoce, de igual modo, la Carta Circular 2014-14, supra, al explicar lo siguiente:

> A pesar de lo señalado, la agencia o dependencia peticionaria puede, y siempre ha sido nuestra recomendación, formalizar un Acuerdo en el que se haga referencia a los términos y condiciones esenciales de la subasta o del proceso llevado a cabo y en el que se convengan los términos particulares de la contratación, es decir, el detalle de la necesidad de los servicios requeridos por dicha agencia o dependencia peticionaria.

Como puede apreciarse, la propia Administración sugiere otros mecanismos, más allá de los contemplados en su normativa, para garantizar una sana administración pública.

En fin, debemos tener presente que todo contrato con el Gobierno de Puerto Rico está revestido de interés público. Por tanto, como mínimo, debemos exigir que las partes en un contrato gubernamental cumplan con los términos y condiciones pactadas. Más aún, cuando el acuerdo tiene implicaciones en los fondos públicos. En consecuencia, a la luz de los fundamentos expuestos, resulta forzoso concluir que Génesis estaba obligada por los términos que pactó con la Administración, por lo que debió suscribir un contrato directamente con el Departamento del Trabajo previo a la concesión de sus servicios. Así, procede la desestimación del caso de epígrafe.

En virtud de lo anterior, concluimos que el Tribunal de Primera Instancia erró al determinar que la Carta

Circular 2014-14, <u>supra</u>, permitía que las partes obviaran tal requisito expresamente pactado. De igual modo, el Tribunal de Apelaciones erró al resolver que restaban controversias de hecho que atender. Las controversias de hecho aducidas por el foro apelativo constituyen controversias de derecho cuyas respuestas son encontradas en la normativa aquí interpretada. En consecuencia, erró al determinar que se debía devolver el caso al foro primario para dilucidar si los requerimientos por escrito que realizó el Departamento del Trabajo constituyen o no una orden de compra, pues ello no subsanaría la falta de un contrato.

## IV

Al amparo de los fundamentos enunciados, revocamos la determinación del Tribunal de Apelaciones y reinstalamos el dictamen del Tribunal de Primera Instancia, aunque por fundamentos distintos.

Se dictará sentencia de conformidad.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Génesis Security Services, Inc.<br><br>Recurrida<br><br>v.<br><br>Departamento del Trabajo y Recursos Humanos; Estado Libre Asociado de Puerto Rico<br><br>Peticionarios | CC-2019-0360 | *Certiorari* |

SENTENCIA

San Juan, Puerto Rico, a 18 de agosto de 2020.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de le presente Sentencia, se revoca la determinación del Tribunal de Apelaciones y se reinstala el dictamen del Tribunal de Primera Instancia, aunque por fundamentos distintos.

Lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre sin opinión escrita.


Jose Ignacio Campos Pérez
Secretario del Tribunal Supremo