Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| GREENGIFT CAPITAL LLC<br><br>Parte Apelada<br><br>v.<br><br>MUNICIPIO AUTÓNOMO DE GUÁNICA<br><br>Parte Apelante | TA2025AP00437 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.: PO2023CV03145<br><br>Sobre: Cobro de Dinero |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Bonilla Ortiz y la Jueza Martínez Cordero

**Ortiz Flores, Jueza Ponente**

## SENTENCIA

En San Juan, Puerto Rico, a 27 de febrero de 2026.

Comparece ante este Tribunal de Apelaciones el Municipio Autónomo de Guánica (Municipio; apelante) y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI) el 28 de julio de 2025 y notificada al día siguiente 29 de julio de 2025. En el aludido dictamen, el foro primario declaró Ha Lugar la *Demanda* presentada por la corporación Greengift Capital, LLC (Greengift; apelada) y ordenó al Municipio pagar a favor de la apelada un total de $36,500.00.

Adelantamos que, por los fundamentos que discutiremos a continuación, confirmamos la *Sentencia* apelada.

**I**

Según surge del expediente, el 20 de octubre de 2023, la corporación Greengift Capital instó una *Demanda* por cobro de dinero contra el Municipio de Guánica.[1] En su reclamo, Greengift alegó que el 19 de septiembre de 2022 el Municipio le solicitó una cotización respecto a un generador marca Caterpillar, Modelo 3406, de 400 kilovatios y 450 amperes

---

[1] SUMAC, Entrada 1 en PO2023CV03145.

con función base de diésel. Dicho generador incluía sesenta (60) días de mantenimiento con la condición de que este se aceptara "as is" por tratarse de un equipo usado. Arguyó también que, al día siguiente, 20 de septiembre de 2022, el Municipio emitió la Orden de Compra PO202300494 para adquirir el generador cotizado. Luego de aprobada la orden, Greengift alegó que hizo entrega del equipo y este fue utilizado para suministrar energía al Centro de Diagnóstico y Tratamiento Juan M. Santiago. No obstante, el 3 de noviembre de 2022, Greengift expuso que fue notificado de que el Municipio no estaba interesado en el equipo entregado por deficiencias en su condición sin este último haber emitido pago alguno. Posteriormente, Greengift, reclamó al Municipio el pago de los $35,000.00 adeudados mediante misiva dirigida al alcalde Ismael Rodríguez. Al no recibir respuesta al respecto, Greengift acudió al foro judicial.

Así las cosas, el 9 de enero de 2026, el Municipio presentó su *Contestación a Demanda* y alegó que desde un principio notificó que el equipo no se podía aceptar debido a las condiciones pobres en las que se encontraba y el costo de $35,000.00 era muy alto para la unidad que se entregó.[2] Luego de algunos trámites procesales, el juicio en su fondo fue celebrado el día 21 de marzo de 2025. Por tanto, aquilatada la prueba documental y oral presentada, el caso quedó sometido y el 28 de julio de 2025 el foro primario emitió su *Sentencia* la cual notificó a las partes el día siguiente 29 de julio de 2025.[3] En su dictamen, el TPI precisó las siguientes determinaciones de hechos:

1. Greengift es una compañía de responsabilidad limitada debidamente organizada bajo las leyes del Estado Libre Asociado de Puerto Rico.
2. El Municipio de Guánica, conforme a lo establecido en el Artículo 1.008, inciso (b) del Código Municipal de Puerto Rico, Ley Núm. 107 de 14 de agosto de 2022, según enmendado, tiene el poder de demandar y ser demandada.
3. El 16 de septiembre de 2022, el Municipio emitió la Orden Ejecutiva Núm. 3, Serie 2022-2023, para declarar un estado de emergencia en toda la jurisdicción del Municipio de Guánica como

---

[2] SUMAC, Entrada 8 en PO2023CV03145.
[3] SUMAC, Entrada 44 en PO2023CV03145.

consecuencia del inminente paso de la tormenta Fiona. Mediante el párrafo 5 de la Sección 2 de la Orden Ejecutiva, el Municipio dejó sin efecto los procedimientos usuales para la compra de bienes y servicios, indicando que tales procesos serían tramitados directamente por la Directora de Finanzas, previa aprobación del Alcalde.

4. El 19 de septiembre de 2022, el Municipio solicitó de Greengift una cotización para la compra de un generador de energía de cuatrocientos kilovatios (400 kW).

5. Las conversaciones del Municipio con relación a esa necesidad de equipo se llevaron a cabo con el Sr. Jonathan J. Malavé, representante de Greengift.

6. El 19 de septiembre de 2022, Greengift remitió al Municipio la cotización solicitada con respecto a un generador marca Caterpillar, Modelo 3406, de 400 kilovatios y 450 amperes, con función a base de diésel.

7. La propuesta de venta fue por la cantidad de $35,000.00, incluía 60 días de mantenimiento, y la condición de aceptación del equipo era "as is", por ser un equipo usado.

8. El 20 de septiembre de 2022, el Municipio emitió a Greengift la Orden de Compra PO202300494, bajo el formulario oficial OCAM AP04, a los fines de comprar por el precio de $35,000.00 el generador Caterpillar descrito en la cotización, y, además, un transfer switch por el precio de $1,500.00.

9. En la orden de compra núm. PO202300494 del 20 de septiembre de 2022 aparece firmada por el Alcalde o Representante autorizado, el Jefe de la Dependencia y el Director de Finanzas o su Representante Autorizado, la cual certifica la disponibilidad de los fondos.

10. La Orden de Compra núm. PO202300494 establece que el equipo debía ser entregado en la Dependencia o Programa de la Defensa Civil.

11. En la Orden de Compra núm. PO202300494 se describe el generador como Caterpillar Modelo 3406 Stanby Generator Pre Owned por el valor de $35,000 y un transfer switch por la suma de $1,500.00, para un total de $36,500.00.

12. El Municipio Autónomo de Guánica no ha realizado el pago de la Orden de Compra.

13. El 9 de marzo de 2023 se envió una carta por correo certificado núm. 7022 3330 0002 0446 4356 y 7022 3330 0002 0446 4349, dirigida al Alcalde del Municipio de Guánica, Hon. Ismael Rodríguez Ramos, con copia a la Directora de Finanzas del Municipio, la Sra. Grety Martínez Fernández, en donde solicita el pago de $35,000.00.

14. Greengift facturó por los servicios y certificó, bajo pena de nulidad absoluta, que ningún servidor público de entidad gubernamental es parte o tiene algún interés

en las ganancias o beneficios producto de la Orden de Compra objeto de la factura y que la única consideración para suministrar los bienes objeto del contrato fue el pago acordado con el representante autorizado del Municipio de Guánica.

15. El 3 de noviembre de 2022, un ayudante ejecutivo del Alcalde, Joel Rodríguez, se comunicó con Greengift para indicar que el generador estaba en condiciones muy pobres, que el mismo no podía ser aceptado por el Municipio de Guánica, que la orden estaba siendo cancelada y solicitó que el mismo fuera retirado de las facilidades del Municipio.

16. El 3 de noviembre de 2022, Greengift notificó una carta al alcalde del Municipio de Guánica con respecto a la determinación informada por el ayudante ejecutivo sobre la decisión sobre el generador.

17. El Sr. Jonathan Javier Malavé Pérez (en adelante "Sr. Malavé") reside en San Juan, PR y es agente de servicios de la entidad Greengift Capital LLC. (parte demandante).

18. El Sr. Malavé indicó que para el 20 de septiembre de 2022 realizó la venta de un generador eléctrico al Municipio de Guánica. Esto, pues tras el paso del Huracán Fiona se declaró estado de emergencia en Puerto Rico debido a que muchos municipios se encontraban sin servicio de energía eléctrica y el Municipio de Guánica necesitaba un generador eléctrico para el Centro de Diagnóstico y Tratamiento (CDT) del Municipio.

19. El Sr. Malavé indicó que el generador eléctrico fue entregado el 20 de septiembre de 2022. Añadió que alrededor de dos días antes se comunicaron del Municipio de Guánica solicitando un generador eléctrico para el CDT de Guánica.

20. El Sr. Malavé indicó que, en aquel momento, el Municipio había solicitado más de un generador, pero solo tenían uno disponible.

21. El Sr. Malavé manifestó que sostuvo conversaciones con el Sr. Joel Rodríguez, relacionadas a la necesidad que tenía el Municipio de Guánica. Indicó recordar que el Sr. Rodríguez se identificó como ayudante del alcalde.

22. El Municipio estaba solicitando un generador de 400 kilos con un transfer switch automático para poderlo conectar a las facilidades del CDT.

23. El Sr. Malavé indicó que se le envío al Municipio las horas de uso del generador junto con unas fotografías y videos de este previo a la entrega.

24. El Sr. Malavé indicó haber tirado unas fotografías por medio de una aplicación que utiliza georreferencia y cuando se toma una foto desde la aplicación le dice el lugar, fecha y hora de donde fue tomada esa foto. Indicó que utiliza esa aplicación tanto para entrega de bienes como para algún proceso de inspección de

algún tipo de proyecto. El propósito principal de las fotografías fue hacer constancia de que se entregó el generador en la fecha, hora y lugar estipulado.

25. En las fotografías, el Sr. Malavé señaló que se puede observar la planta eléctrica que se llevó sobre el camión de plataforma al lugar donde se entregó. Declaró el testigo que en la primera foto están con el lifter bajando el generador eléctrico para moverlo hacia el otro camión que trajo el Municipio.

26. El Sr. Malavé indicó que la persona que aparece en la primera foto se identificó como personal del Municipio. Indicó que también se encontraba el Sr. Joel Rodríguez, quien luego de que entregó el purchase order (PO), se retiró diciendo que tenía que ir a una reunión en el Municipio.

27. El Sr. Malavé declaró que cuando dice PO se refiere a la orden de compra que le dio el Municipio de Guánica relacionada al generador que se iba a entregar.

28. El Sr. Malavé indicó que el Sr. Joel Rodríguez fue quien le envió el pin location del lugar donde se entregaría el generador, que, en aquel momento, aparecía en Google Maps como la casa Alcaldía temporera.

29. El Sr. Malavé indicó que en la segunda foto se puede ver que a las 3:52pm fue el momento en que más o menos llegaron al lugar con el generador y se tiró la foto.

30. El Sr. Malavé indicó que dicho lugar eran unas facilidades municipales y que había vehículos oficiales del Municipio. Sostuvo que las instrucciones que le enviaron era que llegaran a ese lugar particular y hacer entrega del equipo.

31. En la tercera foto, según indicó el Sr. Malavé, se puede ver la plataforma que trajo el Municipio junto con el Sky Track que se iba a utilizar para poder bajar el generador eléctrico de su plataforma.

32. El Sr. Malavé declaró que, tan pronto se hizo la entrega del generador, el personal del Municipio lo movió hacia la otra plataforma y le indicaron que se iba a instalar en el CDT del Municipio.

33. Según indicó el Sr. Malavé, el personal del Municipio prendió el generador para asegurarse de que estuviera en funcionamiento y luego le indicaron que podían irse del lugar ya que todo se encontraba en orden.

34. El Sr. Malavé reiteró que el Sr. Joel Rodríguez se encontraba presente al momento de la entrega. Indicó que el Sr. Rodríguez tenía el papel físico del PO, el cual había sido enviado previamente mediante correcto electrónico. Indicó que el Sr. Rodríguez le entregó el documento y cuando empezaron a remover el generador hacia la otra plataforma, éste se retiró debido que tenía una reunión, pero se quedó el personal a cargo.

35. El Sr. Malavé reiteró que el personal del Municipio a cargo abrió el generador, lo prendieron para asegurarse que funcionara, luego lo apagaron y lo movieron hacia la otra plataforma.

36. El Sr. Malavé indicó que la capacidad de funcionamiento del generador es de 400 kilos.

37. El Sr. Malavé indicó que en la cotización del generador se menciona que tiene un mantenimiento por 60 días.

38. El Sr. Malavé indicó que cuando llegó la fecha que se había coordinado para ir a darle el mantenimiento al generador, el Sr. Joel Rodríguez les indicó que no era necesario.

39. El Sr. Malavé indicó que ningún personal del Municipio le expresó alguna queja sobre el funcionamiento del equipo. Recordó que posteriormente es que comenzaron las comunicaciones por parte del Sr. Joel Rodríguez.

40. A preguntas en contrainterrogatorio, el Sr. Malavé respondió que la persona de camisa roja que aparece en la fotografía 117, que está de espalda, se identificó como personal del Municipio y el Sr. Rodríguez le indicó que ellos estaban en su representación y los dejó a cargo.

41. A preguntas en contrainterrogatorio, el Sr. Malavé admitió que esas facilidades donde se tomaron las fotos es el estacionamiento de la casa Alcaldía de Guánica, alrededor de las 4:00pm.

42. A preguntas en contrainterrogatorio, el Sr. Malavé respondió que no pudo observar si el Skytrak tenía alguna identificación que correspondiera al Municipio de Guánica.

43. A preguntas en contrainterrogatorio, el Sr. Malavé respondió que en las fotografías no se muestra el momento en que se estaba haciendo la prueba al generador ni sale el Sr. Joel Rodríguez Almodóvar.

44. A preguntas en contrainterrogatorio, el Sr. Malavé admitió que la orden de compra señalaba que el equipo se tenía que entregar en las facilidades de la Defensa Civil del Municipio de Guánica.

45. A preguntas en contrainterrogatorio, el Sr. Malavé admitió que ese día, debido a la emergencia, la Alcaldía estaba cerrada.

46. A preguntas en contrainterrogatorio, el Sr. Malavé admitió que en las fotografías no se observa en el generador ninguna marca que identifique la capacidad.

47. A preguntas en contrainterrogatorio, el Sr. Malavé respondió que nunca recibieron quejas sobre el funcionamiento o capacidad del generador.

48. A preguntas en contrainterrogatorio, el Sr. Malavé respondió que cuando se iba a hacer el mantenimiento al generador, el Sr. Joel Rodríguez les dijo que no era necesario porque ya no necesitaban el generador. Indicó que, antes de eso, nunca le comunicaron que el

generador no estaba funcionado y que no estaba operando.

49. A preguntas en contrainterrogatorio, el Sr. Malavé respondió que posteriormente el Sr. Joel Rodríguez envió una carta indicando que el generador nunca se utilizó. Indicó no recordar si en la carta se hablaba de la capacidad del generador.

50. El Sr. Joel Rodríguez Almodóvar es residente de Gúanica, Puerto Rico y trabaja como Ayudante Ejecutivo del Alcalde de Municipio de Guánica, posición en la cual lleva alrededor de 4 años. Anteriormente, se desempeñaba como Inspector de Proyecto de Fondos Federales en el mismo Municipio de Guánica. Indicó que lleva laborando en el Municipio de Guánica desde el 2011 al presente.

51. El Sr. Rodríguez indicó que para el 2022 se desempeñaba como Ayudante Ejecutivo del Alcalde de Guánica.

52. El Sr. Rodríguez indicó que para septiembre de 2022 el país estaba atravesando por el desastre del Huracán Fiona.

53. El Sr. Rodríguez indicó que, como parte de su trabajo, estaba coordinando la recuperación del Municipio. Indicó que para ese momento lo primordial era el CDT de Guánica, pues se había dañado el generador eléctrico y tuvo que buscar una alternativa para comprar otro generador.

54. El Sr. Rodríguez indicó no conocer a la compañía Greengift ni haber escuchado ese nombre anteriormente.

55. El Sr. Rodríguez indicó que se comunicó con la Sra. Mariela Quiñones, quien empezó a hacer las gestiones para conseguir el generador nuevo. Indicó que la Sra. Quiñones le recomendó al Sr. José Malavé, quien tenía un generador disponible.

56. El Sr. Rodríguez indicó que no conocía al Sr. José Malavé y que no lo había visto hasta el día de esta vista.

57. El Sr. Rodríguez indicó que el Sr. Malavé primero les dio una oferta sobre el costo del generador y el Municipio procedió a evaluarla, pero entendían que ese dinero no estaba disponible. Indicó que el Sr. Malavé les hace una segunda oferta, la cual entendieron que era apropiada.

58. El Sr. Rodríguez indicó que necesitaban urgente un generador de un mínimo de 400 kilos para dar el servicio en el CDT de Guánica.

59. El Sr. Rodríguez indicó que se realizó la orden para entonces adquirir el generador por el precio que era razonable de la segunda oferta.

60. El Sr. Rodríguez indicó que el Sr. Malavé, le solicitó que debía tener la orden de compra para entonces poder entregar el equipo.

61. El Sr. Rodríguez indicó que le envió la orden de compra al Sr. Malavé y que, a su entender, fue el Sr. Malavé quien envió el equipo.

62. El Sr. Rodríguez indicó no saber quien recibió el generador. En cuanto a la fecha en que se recibió el generador, indicó que pudo ser entre el 20 y 21 de septiembre.

63. El Sr. Rodríguez indicó que se enteró de la existencia del generador al día siguiente de la entrega. Aseveró que dicho generador fue dejado en los predios de la casa alcaldía temporal.

64. El Sr. Rodríguez indicó que lo primero que hizo mandar a mover el generador de lugar. Indicó que le pidió al Sr. Efraín López de West Development, quien era uno de los contratistas que en ese entonces estaba trabajando con el Municipio, que moviera el equipo hasta el lugar en donde se encuentra actualmente.

65. El Sr. Rodríguez indicó que luego de moverlo intentó prenderlo, pero el generador no prendió. Acto seguido, el Sr. Rodríguez junto al Sr. López y otra persona, procedieron a revisar las condiciones del generador.

66. El Sr. Rodríguez indicó que según su criterio el generador no se veía en buenas condiciones. Según el Sr. Rodríguez, observó que el "mofle" no pertenecía a ese equipo.

67. El Sr. Rodríguez indicó que luego de evaluar el generador, procedió a informarle al Alcalde que el generador no funcionaba.

68. El Sr. Rodríguez indicó que intentó comunicarse con el Sr. Malavé para decirle que no iban a utilizar el generador y devolverlo porque no era lo que él esperaba.

69. El Sr. Rodríguez indicó que el 3 de noviembre de 2022 envió un correo electrónico dirigido al dueño de la compañía con copia al Sr. Malavé.

70. El Sr. Rodríguez indicó que antes de esa fecha, 3 de noviembre de 2022, la compañía ni el Sr. Malavé se habían comunicado con él.

71. El Sr. Rodríguez indicó que en el correo electrónico le informó que el generador no era de la capacidad que el Municipio necesitaba y que procedieran a recogerlo.

72. El Sr. Rodríguez indicó que, hoy en día, el generador se encuentra en los predios de la casa alcaldía temporal.

73. El Sr. Rodríguez indicó que no se le ha dado ningún uso a esa unidad ni se ha prendido.

74. El Sr. Rodríguez indicó que en las fotografías provistas por la parte demandante no se ve ningún empleado municipal.

75. El Sr. Rodríguez indicó que la persona encargada en el municipio de recibir propiedad es la Sra. Annette Jusino, Encargada de Propiedad.

76. A preguntas en contrainterrogatorio, el Sr. Rodríguez admitió que el lugar que muestran las fotografías es lo

que se conoce como la Alcaldía provisional del Municipio de Guánica.

77. A preguntas en contrainterrogatorio, el Sr. Rodríguez admitió que fue él quien le indicó al Sr. Jonathan Malavé, por mensaje de texto, que entregara ese equipo en ese lugar. Admitió que fue él quien le brindó dichas instrucciones y le envió la localización de lo que era la Alcaldía.

78. A preguntas en contrainterrogatorio, el Sr. Rodríguez admitió que no le informó a la Sra. Jusino que tenía que estar ese día para recibir la propiedad.

79. A preguntas en contrainterrogatorio, el Sr. Rodríguez admitió que el 20 de septiembre de 2022, el Sr. Jonathan Malavé se comunicó con él mediante la aplicación WhatsApp para informarle que ya estaban montando el generador, que necesitaba que él le enviara la Orden de Compra para poder salir a hacer la entrega.

80. A preguntas en contrainterrogatorio, el Sr. Rodríguez admitió haber hecho la Orden de Compra, pero no recordó a nombre de quien.

81. A preguntas en contrainterrogatorio, el Sr. Rodríguez admitió haberle solicitado al Sr. Malavé, por mensaje de WhatsApp, las horas de uso de ese generador.

82. A preguntas sobre si el Sr. Malavé le contestó que el generador tenía 2,796 horas de uso, el Sr. Rodríguez indicó no recordar, pero que sí le contestó el mensaje.

83. A preguntas en contrainterrogatorio, el Sr. Rodríguez admitió que la inspección del generador no la hizo personal de Municipio, aunque él estaba presente.

84. A preguntas en contrainterrogatorio, el Sr. Rodríguez respondió que en la primera evaluación del generador nunca prendió y estaba en malas condiciones.

85. A preguntas de este Tribunal, el Sr. Rodríguez admitió haber participado en las conversaciones y orden de compra sobre el generador y haberle enviado al Sr. Malavé un pin de localización, de dónde debía ser entregado ese equipo.

86. A preguntas de este Tribunal, el Sr. Rodríguez respondió haberle enviado la Orden de Compra al Sr. Malavé por WhatsApp. Indicó que al momento en que se da la entrega del generador él se encontraba en el Centro de Envejecientes, ya que ahí fue que se estableció lo que le llaman el COE del municipio durante la emergencia. Durante ese periodo, el Sr. Rodríguez se transportaba en vehículo oficial.

87. A preguntas de este Tribunal, el Sr. Rodríguez respondió que en el momento en que no pudieron prender el generador le escribió al Sr. Malavé que lo llamara lo más pronto posible. Admitió que no sabía prender ese generador.

88. A preguntas de este Tribunal, el Sr. Rodríguez indicó no recordar cuanto tiempo transcurrió entre la primera vez que el generador no prendió y la segunda vez en

que fueron nuevamente a prenderlo. Indicó no saber lo que ocurrió en la segunda inspección porque no estuvo presente.

89. A preguntas de este Tribunal, el Sr. Rodríguez indicó no saber quién supervisó, en representación del Municipio, esa segunda inspección para tratar de prender el generador porque estaban durante la emergencia. Indicó que no sabe si en esa segunda inspección lo prendieron o no. No obstante, indicó que, como resultado de esa segunda gestión, el perito electricista generó un informe.

90. En relación con la garantía del generador, a preguntas de este Tribunal, el Sr. Rodríguez indicó que no se le hizo un reclamo a la compañía porque específicamente informaron que no querían el generador.

91. A preguntas de este Tribunal, sobre la comunicación cursada y que en ella se menciona que el generador tuvo dificultad para su arranque y encendido, el Sr. Rodríguez indicó que con dificultad se refería a que el generador no prendió.

92. El Sr. Jensen Riopedre Gómez reside en Sabana Grande, es perito electricista desde 2017, su número de licencia 13150. Además, tiene certificación como Instalador de Sistemas Fotovoltaicos.

93. El Sr. Riopedre preparó un Informe a petición del Municipio de Guánica acerca del generador Caterpillar en controversia.

94. El Sr. Riopedre indicó haber inspeccionado el generador el 20 de mayo de 2024 en el estacionamiento de la Alcaldía del Municipio de Guánica. Indicó que el número de serie del equipo es el 62B1303 serie A, el cual surge del Informe.

95. El Sr. Riopedre indicó que la capacidad del breaker o interruptor de seguridad del generador es de 350 amperes.

96. El Sr. Riopedre indicó que primero procedió a hacer una inspección visual del generador, observando que hay piezas que las cambiaron, la cabina ha sido remendada, que estaba en un estado de deterioro avanzado, con corrosión y le pusieron casero o sea homemade los cierres, los cuales cualquier persona los puede abrir fácilmente.

97. El Sr. Riopedre indicó que la cablería no estaba en condiciones para energizar ya que tenía cables con la insolación dañada, cuarteada.

98. El Sr. Riopedre explicó que le hizo una prueba al diésel arrojando positivo a agua, lo que puede ocasionar un daño al motor.

99. El Sr. Riopedre indicó que el generador no se podía encender porque no tenía batería y los cables no representaban una condición segura.

100. El Sr. Riopedre indicó que el generador no pasa ni siquiera una inspección visual. Aseveró que el equipo

no tiene su data completa, que no tiene una placa donde indique la capacidad, los voltajes ni cuando fue fabricado. Indicó que solamente tiene una data de una placa que indica el número de serie del motor y el arreglo del alternador.

101. El Sr. Riopedre indicó que también pudo observar que en el sistema de escape tiene soldaduras en varios sitios, por lo que dicha pieza debía ser reemplazada.

102. El Sr. Riopedre indicó que por la antigüedad del equipo la Caterpillar ya no tiene data sobre el equipo. Indicó que buscó en internet y encontró unos generadores similares, los cuales adjunto al Informe como referencia.

103. El Sr. Riopedre indicó que realizó un cómputo matemático a base de la Ley de Watt para determinar la capacidad del generador, el cual le dio a 210 kilos.

104. El Sr. Riopedre explicó que, a base de la Ley de Watt, se multiplica voltaje por los amperes. Indicó que el generador es de 350 watts y el voltaje es 480. Por ende, cuando hace la multiplicación de 480 x 350 watts y añade un 25% para los picos de energía, obtiene el resultado de que es para 210 kilowatts.

105. El Sr. Riopedre indicó que el generador no es de 400 kilowatts. Aseveró que el generador es básicamente un 50% de capacidad a los 400 kilos. Es decir, que es un generador mucho más pequeño.

106. El Sr. Riopedre indicó que el generador no tiene una placa con modelo, información o algo que diga sus especificaciones.

107. A preguntas en contrainterrogatorio, el Sr. Riopedre indicó que desde la ocurrencia del Huracán María ha trabajado con el Cuerpo de Ingenieros y FEMA instalándole generadores a distintas facilidades de gobierno, de emergencia como hospitales, cuarteles de policía, tribunal, bombas de agua.

108. A preguntas en contrainterrogatorio, el Sr. Riopedre indicó desconocer cuales eran los acuerdos entre el Municipio y Greengift.

109. A preguntas en contrainterrogatorio, el Sr. Riopedre indicó no tener ningún tipo de relación contractual con el Municipio de Guánica.

110. A preguntas en contrainterrogatorio, el Sr. Riopedre indicó haber llamado a Ring Power, un dealer autorizado de Caterpillar en Florida, EE. UU. y no pudo confirmar el año de fabricación de este generador. No obstante, no lo mencionó en su Informe y sólo consignó que trató de determinar eso a través del internet.

111. A preguntas en contrainterrogatorio, el Sr. Riopedre admitió que la inspección al generador fue realizada el 20 de mayo de 2024.

112. A preguntas en contrainterrogatorio, el Sr. Riopedre indicó desconocer que el generador había sido entregado al Municipio el 20 de septiembre de 2022.

113. A preguntas en contrainterrogatorio, el Sr. Riopedre indicó su evaluación se basó en un cálculo matemático y que no podía hacer una evaluación del desempeño debido a que el generador no estaba en condiciones de poderlo operar.

114. A preguntas en contrainterrogatorio, el Sr. Riopedre admitió que se hubiera podido determinar la potencia del generador utilizando analizadores de potencias o el banco de carga, si se hubiese corregido lo del agua en el diésel y los cables y se encendía el mismo. Indicó que no mencionó en su Informe la posibilidad para determinar la potencia del generador mediante la utilización de esos sistemas.[4]

Considerado lo anterior, el foro de instancia declaró Ha Lugar la *Demanda* presentada por la apelada y condenó al Municipio a pagar la suma de $36,500.00 a favor de Greengift Capital LLC. En su análisis, el tribunal expuso que al amparo del derecho aplicable la orden de compra efectuada entre las partes fue realizada según exige el Código Municipal, por lo que se trataba de un contrato legalmente válido y vinculante. Adicionalmente, el foro primario manifestó que el testimonio del Sr. Jonathan Malavé mereció su entera credibilidad, en cambio el testimonio del Sr. Joel Rodríguez mostró ser contradictorio, ambiguo y confuso. Por tanto, concluyó que Greengift logró probar que existía una deuda válida y que esta no había sido satisfecha por la apelante.

Inconforme con lo decidido, el Municipio presentó una *Moción en Solicitud de Reconsideración*,[5] la cual fue declarada Sin Lugar.[6] Aún inconforme, la apelante acude ante este foro revisor y en su recurso expone los siguientes señalamientos de error:

(1) Primer señalamiento de error
Erró el Tribunal de Primera Instancia al emitir una sentencia que no contiene determinaciones de hechos sobre los hechos medulares del caso, conforme lo exige la Regla 42.2 de Procedimiento Civil.

(2) Segundo señalamiento de error
Erró el Tribunal de Primera Instancia al imponer al Municipio apelante el pago de treinta y seis mil quinientos dólares ($36,500.00) únicamente por la emisión de una orden de compra, sin considerar debidamente que la parte demandante-apelada incumplió con su obligación de entregar la cosa específica objeto del contrato.

---

[4] SUMAC, Entrada 44 en PO2023CV03145, págs. 3-11.
[5] SUMAC, Entrada 47 en PO2023CV03145.
[6] SUMAC, Entrada 48 en PO2023CV03145.

(3) Tercer señalamiento de error
Erró el Tribunal de Primera Instancia al calificar de "contradictorio, ambiguo y confuso" el testimonio del señor Joel Rodríguez Almodóvar y, a la vez, otorgar entera credibilidad al testigo de la parte demandante.

(4) Cuarto señalamiento de error
Erró el Tribunal de Primera Instancia al determinar que el Municipio recibió y aceptó el generador como si se hubiera cumplido la obligación de entrega conforme a la orden de compra.

(5) Quinto señalamiento de error
Erró el Tribunal al restar valor probatorio a la declaración e informe del perito electricista Jensen Riopedre sobre la capacidad del generador objeto de la controversia y en su lugar acoger como veraz el testimonio al respecto de la parte demandante.

El 14 de noviembre de 2025, la Transcripción de Prueba Oral (TPO) fue presentada y esta quedó aprobada mediante *Resolución* el 17 de noviembre de 2025. El 15 de enero de 2025, la Greengift compareció mediante su escrito titulado *Alegato de la Parte Apelada*, por lo que el recurso quedó perfeccionado y listo para su adjudicación.

## II

## A

Debido a la obligación del Estado en cuanto a manejar los fondos públicos bajo los principios fiduciarios y éticos, se ha dispuesto de unos requisitos en cuanto a la contratación gubernamental. *Rodríguez Ramos v. ELA*, 190 DPR 448, 456 (2014). En lo pertinente, la Constitución de Puerto Rico dispone que, "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley." Art. VI, Sec. 9, Const. ELA, LPRA, Tomo 1. Así, el Tribunal Supremo ha interpretado que con el fin de garantizar una sana administración de los fondos públicos, los contratos gubernamentales deben cumplir con los siguientes requisitos: (1) constar por escrito; (2) se debe mantener un registro fiel con miras *a prima facie* establecer su existencia; (3) se remita copia a la Oficina del Contralor como medio de una doble constancia de su otorgamiento, términos y existencia, y (4) se acredite la certeza de tiempo, esto es, haber

sido realizado y otorgado quince (15) días antes. *Ocasio v. Municipio de Maunabo*, 121 DPR 37, 54 (1988).

En ocasión de cumplir con el citado mandato constitucional, la legislatura ha aprobado leyes que imponen controles fiscales y de contratación gubernamental de manera que las entidades gubernamentales cumplan con este precepto para una sana administración de los fondos públicos. *Rodríguez Ramos v. ELA*, *supra*. En específico, la Asamblea Legislativa aprobó la Ley Núm. 107-2020, según enmendada, conocida como Código Municipal de Puerto Rico (Código Municipal), 21 LPRA sec. 7001 *et seq*. El referido estatuto, compila de manera sistemática, ordenada y actualizada, todas las leyes existentes y vinculadas a la organización, gobierno, administración y funcionamiento de los municipios. Código Municipal, *supra*, 21 LPRA sec. 7002. En lo que respecta al caso ante nos, el Artículo 8.001 define en su inciso 170 lo que constituye una obligación, que es como sigue:

> Todo bono o pagaré, pago convenido bajo un contrato o instrumento de servicio o de arrendamiento, deuda, cargo u obligación de similar naturaleza del municipio. **Todo compromiso contraído legalmente válido que esté representado por orden de compra, contrato o documento similar, pendiente de pago, debidamente firmado y autorizado por los funcionarios competentes para gravar las asignaciones y que es o puede convertirse en deuda exigible.** (Énfasis nuestro.) 21 LPRA sec. 8295.

Ello implica que una orden de compra realizada según las exigencias estatutarias representa una obligación o contrato entre las partes. Por tanto, cabe que señalar que, el requisito de que los contratos obren por escrito "se ha convertido en uno de carácter formal y sustantivo, cuyo propósito principal es evitar el desembolso ilegal de fondos gubernamentales, [y] fomentar la transparencia en la gestión pública". R. de Félix Dávila, *El Estado como contratante: hacia un nuevo modelo de contratación gubernamental*, 84 Rev. Jur. UPR 1137, 1141 (2015).

**B**

De ordinario, los tribunales apelativos aceptamos como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su

apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en sala. Después de todo, la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz. Por definición, un tribunal de instancia está en mejor posición que un tribunal apelativo para llevar a cabo esta importante tarea judicial.

Según lo dispuesto en la Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, **"[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos".** (Énfasis nuestro.) Por consiguiente, se ha reconocido por nuestro más alto foro que los jueces de instancia son quienes están en mejor posición de aquilatar la prueba; por ello, su apreciación nos merece gran respeto y deferencia. *S.L.G. Rivera Carrasquillo v. A.A.A*, 177 DPR 345, 356 (2009). Debemos recordar que el tribunal revisor solo cuenta con récords mudos e inexpresivos por lo cual, debemos conferirle respeto a la adjudicación de credibilidad emitida por los foros primarios. *Id.* "Por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada ya que él fue quien oyó y vio declarar a los testigos". *Argüello v. Argüello*, 155 DPR 62, 79 (2001). Cualquier conflicto que surja sobre alguna prueba debe ser resuelto por el foro competente, es decir el foro primario. *S.L.G. Rivera Carrasquillo v. A.A.A*, *supra*, que cita a *Trinidad v. Chade*, 153 DPR 280 (2001).

**Es norma fundamental en nuestro ordenamiento jurídico que los tribunales apelativos, ante la ausencia de error manifiesto, prejuicio, pasión o parcialidad, no deberán intervenir con las conclusiones de hechos, apreciación de la prueba y adjudicaciones de credibilidad emitidas por los tribunales de instancia.** *Argüello v.*

*Argüello*, *supra*, pág. 78; *S.L.G. Rivera Carrasquillo v. A.A.A*, *supra*, pág. 356; *Pueblo v. Acevedo Estrada*, 150 DPR 84 (2000). En consecuencia, la intervención por parte de un foro apelativo sólo procederá "**en casos en que [de] un análisis integral de [la] prueba cause en nuestro ánimo una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia".** (Énfasis nuestro.) *S.L.G. Rivera Carrasquillo v. A.A.A*, *supra*, que cita a *Pueblo v. Cabán Torres*, 117 DPR 645, 648 (1986). Para lograr la revocación, le corresponde al apelante determinar y demostrar la base para dicho fundamento. *S.L.G. Rivera Carrasquillo v. A.A.A*, *supra*; *Pueblo v. Cabán Torres, supra.* De igual forma, "la parte que cuestione una determinación de hechos realizadas por el foro primario debe señalar el error manifiesto, o fundamentar la existencia de pasión perjuicio o parcialidad". *S.L.G. Rivera Carrasquillo v. A.A.A, supra*, que cita a *Flores v. Soc. Gananciales*, 146 DPR 45, 49 (1998).

A su vez, se ha enfatizado que un "foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia". *Argüello v. Argüello, supra*, pág. 78 que cita a *Rolón v. Charlie Car Rental Inc.*, 148 DPR 420, 433 (1999). De igual forma estamos conscientes que con relación a la prueba documental nos encontramos en la misma posición que el foro de instancia. *Trinidad v. Chade*, *supra*.

Por otra parte, la Regla 110 de Evidencia, 32 LPRA Ap. VI R. 110, dispone en lo pertinente al caso de autos lo siguiente:

> **La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:**
>
> […]
>
> (**D) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.**
>
> **(E) La juzgadora o el juzgador de hechos no tiene la obligación de decidir de acuerdo con las declaraciones de cualquier cantidad de testigos que no le convenzan**

**contra un número menor u otra evidencia que le resulte más convincente.** (Énfasis nuestro.)

Como resultado, se recalca la deferencia que se le debe otorgar al foro primario al estar en mejor posición para aquilatar la prueba ante sí ya que no existe duda que dicho foro es el que mejor conoce las particularidades del caso y por tanto es quien puede tomar las mejores medidas para promover el curso adecuado hacia su disposición final como corolario de la búsqueda de la verdad. Ahora bien, debemos recalcar que esta deferencia hacia los tribunales primarios no es absoluta.

**III**

En el caso que nos ocupa, el Municipio de Guánica señala que el TPI incurrió en cinco señalamientos de error. Discutiremos el primero de ellos a continuación y el resto, por guardar relación entre ellos, los discutiremos en conjunto. Veamos.

En el primer señalamiento de error, el Municipio alega que el foro primario desacertó en emitir una sentencia que no comprende determinaciones de hechos sobre hechos medulares del caso conforme a lo establecido en la Regla 42.2 de las de Procedimiento Civil. Una lectura detenida del expediente y la Transcripción de la Prueba Oral (TPO) nos lleva a concluir que no se cometió el error señalado, pues las determinaciones, reflejan una evaluación detallada a formular sus determinaciones de hechos a los fines de adjudicar su dictamen final.

Luego, en cuanto a los señalamientos de errores 2, 3, 4 y 5, antes citados y los cuales se refieren, en cuanto al **segundo señalamiento** sobre la adjudicación del pago del $36,500.00 a Greengift; en cuanto al **tercero y quinto señalamientos de error** sobre la adjudicación de credibilidad de los testimonios del señor Joel Rodriguez Almodoovar y al perito Jense Riopedre y su informe pericial; y, en cuanto al cuarto señalamiento de error sobre la "determinación que el Municipio recibió y aceptó el generador como si se hubiera cumplido la obligación de entrega conforme a la orden de compra"; con el beneficio de la TPO y el expediente ante nosotros nos

lleva a darle deferencia en cuanto a la credibilidad aquilatada la prueba documental y los testimonios. No se cometieron los errores señalados.

**IV**

Por los fundamentos anteriormente expuestos, se confirma el dictamen apelado.

Notifíquese.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones